596 F.2d 726
 19 Fair Empl.Prac.Cas. 668, 19 Empl. Prac.
Dec. P 9118
Dr. Judith M. DAVIS, Plaintiff-Appellant,
v.
Edward WEIDNER, Individually and as Chancellor of the
University of Wisconsin-Green Bay, et al.,
Defendants-Appellees.
 No. 78-1836.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 8, 1979.
Decided April 6, 1979.
 
 Cheryl Rosen Weston, Madison, Wis., for plaintiff-appellant.
 Robert D. Repasky, Asst. Atty. Gen., Madison, Wis., for defendants-appellees.
 Before FAIRCHILD, Chief Judge, SWYGERT, Circuit Judge, and EAST, Senior District Judge.[1]
 SWYGERT, Circuit Judge.
 
 
 1
 Plaintiff Judith M. Davis brought a complaint pursuant to 42 U.S.C. § 2000e-5(f)(3) alleging that the termination of her teaching position at the University of Wisconsin-Green Bay constituted a sexually discriminatory employment practice. The district court granted defendants' motion to dismiss the complaint at the close of plaintiff's case. We affirm the result reached by the district court.
 
 
 2
 Plaintiff was hired as a nontenured instructor in the University of Wisconsin-Green Bay (University) Analysis-Synthesis Concentration beginning in the academic year 1970-71. This appointment was renewed for the following academic year. In the fall of 1971 plaintiff received her doctoral degree and consequently was promoted, becoming an assistant professor. Her teaching and academic duties were not changed by this promotion.
 
 
 3
 Probationary faculty, like plaintiff, at the University are reconsidered annually for retention or termination. Primary responsibility for these decisions rests with the tenured faculty within each concentration; the dean and chancellor can negate an affirmative employment decision made by the departmental faculty, but they cannot themselves decide to retain or tenure a faculty member. In April 1972 the executive faculty committee of plaintiff's department reconsidered plaintiff's status and voted not to retain her. According to University regulations, one year notice of termination was required; thus, plaintiff's employment after this decision was to be terminated at the completion of the 1972-73 academic year. A rehearing was conducted pursuant to University rules in July 1972 and the termination decision was affirmed.
 
 
 4
 Plaintiff appealed this decision to the University Committee, a faculty committee established to advise the University Chancellor on personnel matters. The University Committee recommended that the nonretention decisions be voided because of procedural unfairness. The Chancellor did not void the personnel decisions, but instead substituted different grounds for the nonretention decision and permitted the nonretention notice to stand. The Chancellor ordered that plaintiff be reconsidered for retention with other probationary faculty in light of substantial budget cutbacks at the University. In November 1972 plaintiff filed charges of sex discrimination with the Equal Employment Opportunity Commission (EEOC).
 
 
 5
 Pursuant to the Chancellor's budgetary directive, Dean Beaton ordered the Analysis-Synthesis Concentration Executive Committee to review its probationary faculty and select two members of this faculty for termination. Prior to the review of the full Executive Committee, a subcommittee of the Concentration composed of two women and two men foreign language teachers recommended that plaintiff be terminated. On January 4, 1973 thirteen tenured faculty members voted to select the three probationary faculty (out of five) who would be retained. The results of this committee vote placed plaintiff fourth; accordingly, her notice of nonretention remained in effect. Plaintiff filed additional discrimination charges with the EEOC. Plaintiff sought but was unable to obtain other employment at the University. Her employment at the University was terminated in 1973. To date she has not found other employment as a college French teacher.
 
 
 6
 The complaint in this case was filed April 22, 1974. Originally, the case was assigned to Judge Reynolds in the Eastern District of Wisconsin. The court granted defendants' motion to dismiss that portion of the complaint seeking damages under 42 U.S.C. § 1983. The bench trial commenced on October 25, 1977. On October 27 the trial judge declared a mistrial and transferred the case to another court. The matter was reassigned and the parties stipulated to use of the transcript of the previously held proceedings as part of the record in this new trial. On January 4, 1978 the new district judge dismissed the Board of Regents as a party. The trial commenced on May 15, 1978 and concluded May 17. At the conclusion of the presentation of plaintiff's case, the court granted defendants' motion to dismiss. Plaintiff appeals both the dismissal of the Board of Regents and the dismissal of her complaint.
 
 
 7
 * As a preliminary matter, we hold that the district court's order dismissing the Board of Regents of the University of Wisconsin as a party defendant was improper. The Board was dismissed because it was not named by plaintiff in her charges before the EEOC, and the failure to file charges of discrimination before the EEOC generally precludes bringing an action in federal court pursuant to 42 U.S.C. § 2000e. Terry v. Bridgeport Brass Co., 519 F.2d 806 (7th Cir. 1975); Williams v. General Foods Corp.,492 F.2d 399 (7th Cir. 1974). This filing requirement provides notice to the party charged with a violation and gives that party an opportunity to comply with Title VII before the institution of an action in federal court. Williams, supra, 492 F.2d at 404.
 
 
 8
 Plaintiff consistently named "The University of Wisconsin-Green Bay" as her employer in her discrimination charges. Technically, for the purposes of suit, the University of Wisconsin-Green Bay is not a person but a place. Wisconsin law designates the Board of Regents of the University of Wisconsin System as the corporate entity capable of being sued under Title VII. Wis. Stat. § 36.07. To a layperson, the employer of a teacher at the University of Wisconsin-Green Bay is the University, not a corporate entity created by the state for purposes of suit. And despite the technical discrepancy in plaintiff's formal charges, the Board of Regents appeared by legal counsel through all the administrative proceedings prior to the suit in federal court. Thus, the dual objectives of the requirement that charges be filed with the EEOC were met. We are unwilling to penalize a layperson for failing to heed the precise EEOC filing requirements prior to a federal suit pursuant to 42 U.S.C. §§ 2000e Et seq. under these circumstances. See Love v. Pullman Co., 404 U.S. 522, 526-27, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). Thus, we conclude that the district court's dismissal of the Board of Regents as a party defendant was improper.
 
 II
 
 9
 The appropriate legal standard for "the order and allocation of proof in a private, non-class action challenging employment discrimination" was established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973). See also Furnco Constr. Co. v. Waters, 438 U.S. 567, 572, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). The Court stated:
 
 
 10
 The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
 
 
 11
 Id. at 802, 93 S.Ct. at 1824 (footnote omitted). After a plaintiff establishes such a prima facie case, the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employer's rejection." Id. See also Taylor v. Philips Industries, Inc., 593 F.2d 783, (7th Cir. 1979). If some such reason is advanced by the employer, the focus returns to the plaintiff so that he can "be afforded a fair opportunity to show that (the employer's) stated reason for (the employee's) rejection was in fact pretext." McDonnell, supra, 411 U.S. at 804, 93 S.Ct. at 1825.
 
 
 12
 We see no compelling reason why this model for pleading and proving an employment discrimination claim, "a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination," should not have been applied in this case. Furnco, supra, 438 U.S. at 577, 98 S.Ct. at 2949. Certainly, as the Supreme Court noted in McDonnell :
 
 
 13
 The facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.
 
 
 14
 McDonnell, supra, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824. In this case, however, we believe that the McDonnell test should have been applied.
 
 
 15
 The district judge, in his ruling from the bench dismissing plaintiff's complaint, suggested that the McDonnell standard for a prima facie employment discrimination case was inapplicable because this was a "nonretention" rather than a "failure to hire" case. This distinction has no merit. There is no language in McDonnell suggesting such a limitation to its applicability. Further, the Supreme Court applied McDonnell to a discharge case in McDonald v. Santa Fe Trial Transp. Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Finally, the district court offered no rationale, and we can conceive of none, which would justify translating the factual distinction between nonretention and hiring described by the district judge into a legal distinction about the appropriate pleading and proof model for an employment discrimination case.
 
 
 16
 The University argues that McDonnell should not be applied because this case involves "a simultaneous choice between prospective employees on the basis of relative qualifications under circumstances which involve judgment." Under these circumstances the University suggests that there should be an additional requirement for establishing a prima facie case of employment discrimination: that the complainant's rejection did not result from a Relative lack of qualifications. We do not think that this should be a prerequisite of a prima facie employment discrimination case. It seems more sensible to require the employer, in his rebuttal to the complainant's case, to offer his justification for his employment decision, rather than to force the complainant to refute hypothetical reasons why the employer might have found him relatively less qualified.[2] Establishment of a prima facie case under the McDonnell standard does not constitute an ultimate finding of fact as to discriminatory refusal to hire under Title VII; Furnco, supra, 438 U.S. at 576, 98 S.Ct. 2943; McDonnell is merely a model for ordering and evaluating evidence concerning employment discrimination. The employer can offer his rationale for refusing to hire or for firing the complainant in the second step of the McDonnell model.[3]
 
 
 17
 Plaintiff satisfied the McDonnell requirements for a prima facie showing of employment discrimination. The stipulation of facts indicates that she was a woman, qualified for her position, whose employment was terminated. Subsequently a male colleague was retained in the same position. This showing, however, was rebutted by legitimate, nondiscriminatory reasons for plaintiff's nonretention present in the record developed at trial.[4] The record indicates that the University of Wisconsin-Green Bay became subject to severe budgetary constraints in the early 1970's. Further, enrollment in foreign language courses, including French, was below expectations, resulting in an oversupply of foreign language teachers. Probationary language faculty were logical victims of the budget squeeze.
 
 
 18
 Plaintiff was considered for retention with four other probationary faculty members: a woman in German and three men in French. Plaintiff and one of the male French teachers were not retained. All were considered "qualified" as language teachers although the faculty vote ranking the five instructors placed plaintiff fourth and the other nonretained instructor fifth.
 
 
 19
 A critical factor in plaintiff's nonretention was her aversion to teaching in the Liberal Education Seminars program (LES) which had high student enrollment, administrative support, and separate budgeting (thereby permitting part of the costs of an instructor's salary to be paid out of the LES rather than the departmental budget). LES had informed the Analysis-Synthesis Concentration of plaintiff's unacceptability for their program. Previously, plaintiff had exhibited a disparaging attitude towards teaching in LES. At trial it became clear that plaintiff had encouraged her rejection even more directly. Unbeknownst to her department chairman who was trying to reverse the LES decision, plaintiff had met with the coordinator of LES and had urged him to resist her department head's entreaties. In sum, plaintiff had frustrated attempts to enable her to teach in a university program which possessed greater budgetary flexibility and would have made plaintiff a financially more attractive member of her department. The trial court concluded that this was a legitimate, nondiscriminatory reason for plaintiff's nonretention and we agree.
 
 
 20
 This conclusion does not complete the inquiry required under McDonnell. If plaintiff can demonstrate that the reasons offered by the University were mere pretexts, then her case of employment discrimination will be established. We agree with the trial judge, however, that the University's reasons for not retaining plaintiff were legitimate and uphold the district court's result.
 
 
 21
 Several courts reviewing allegedly discriminatory university hiring practices or decisions have exhibited extraordinary deference to the judgment of university decisionmakers by expressly refusing to subject the reasons given for university employment decisions to more than the most minimal judicial scrutiny. See, e. g., Faro v. New York University, 502 F.2d 1229 (2d Cir. 1974); Lewis v. Chicago State College, 299 F.Supp. 1357 (N.D.Ill. 1969). This judicial posture, although animated by a legitimate desire to avoid judicial intrusion into academic affairs, can lead to the immunization of higher education from the requirements of Title VII. Congress did not intend such a result. In fact, in 1972 Congress deleted an exemption for institutions of higher education which was contained in the original equal employment opportunity legislation. Compare Pub. L. 88-352 § 702 (1964) With Pub. L. 92-261 § 3, 42 U.S.C. § 2000e-1. And the legislative history underlying this amendment reflects Congress' concern with the problem of discrimination against women in academia. See, e. g., H. Rep. 92-238, 92d Cong., 2d Sess., reprinted in (1972) U.S. Code Cong. & Admin. News at 2137, 2155. See also Sweeney v. Board of Trustees of Keene State College, 569 F.2d 169, 175 nn. 10, 11 (1st Cir. 1978). Congress must have recognized that in order to achieve its legislative goals, courts would be forced to examine critically university employment decisions.
 
 
 22
 Judicial hesitance to perform this task cannot be justified by an aversion to reviewing university decisionmaking per se; rather, judicial deference is legitimate only to the extent it is based on a desire to avoid replacing a university's judgments about academic employment with judgments made by the judiciary. And although this problem arises in all contexts in which courts enforce fair employment laws, the problem is particularly acute in academia where the standards used to evaluate personnel are, in some sense, subjective and certainly defy easy measurement by objective criteria. Thus, a court reviewing an academic employment decision is unable to rely on easily ascertainable, objective criteria to determine whether the reasons given for the decision are legitimate or pretextual. The reviewing court finds itself faced with the apparent dilemma of either neglecting its statutory responsibility of insuring fair employment practices in institutions of higher education or usurping the task of the university by making relatively unstructured judgments about the qualifications of academic personnel.
 
 
 23
 Some guidance out of this dilemma can be found in McDonnell and in recent circuit decisions. As McDonnell indicated, a plaintiff attempting to show that the reasons given for an adverse employment decision were pretext "must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision." McDonnell, supra, 411 U.S. at 805, 93 S.Ct. at 1826. And the Supreme Court in McDonnell noted several factors which courts reviewing employment decisions can rely on without replacing the employer's judgment with that of the court. The Supreme Court suggested Inter alia, that a court look to the employer's treatment of the complainant employee during the course of his employment, and the employer's general policy towards minority employment. Id. And the Court said that statistics demonstrating a pattern of discrimination would be relevant to an assessment of this latter factor. Id. See also United States v. Hazelwood School Dist., 534 F.2d 805 (8th Cir. 1976), Vacated on other grounds and remanded, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972) (statistics particularly relevant when employment decision based on "subjective" criteria). The Supreme Court warned, however, that "such general (statistical) determinations, while helpful, may not be in and of themselves controlling as to an individualized hiring decision, particularly in the presence of an otherwise justifiable reason for refusing to rehire." McDonnell, supra, 411 U.S. at 805 n. 19, 93 S.Ct. at 1826. See also Sweeney, supra, 569 F.2d at 174.
 
 
 24
 Several opinions in other employment contexts have focused especially on the presence or absence of procedural safeguards in the employer's decisionmaking process as a means of avoiding judicial review of the substantive merits of an employment decision. Stewart v. General Motors Corp., 542 F.2d 445, 450 (7th Cir. 1976); Hazelwood, supra, 534 F.2d at 813; Rowe, supra, 457 F.2d at 358-59; Singleton v. Jackson Municipal Separate School Dist., 419 F.2d 1211 (5th Cir.) (En banc ), Cert. denied, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970). And we agree that the absence or extreme generality of any predetermined standards for selecting employees, the failure to record evaluations of job applicants, and the absence of minorities on the employment decisionmaking bodies can add credence to the claims of an aggrieved employee, especially when the employer does not rely on objective, easily measured criteria for his employment decision.
 
 
 25
 An examination of the University's reasons for terminating plaintiff does not lead to the conclusion that those reasons were pretexts for discrimination. There was no allegation that plaintiff received different treatment because of her sex prior to the incidents surrounding her termination. The general policy of the University and plaintiff's department towards women was not one which would demand that the University's articulated reason for plaintiff's termination be subjected to special scrutiny.[5] Similarly, the procedural safeguards built into the University hiring system distinguish this case from those in which "subjective" hiring systems were deemed to foster discrimination. We conclude that the University's reasons for refusing to rehire plaintiff, valid on their face, were not pretexts. The University and plaintiff's department were subject to budgetary constraints which plaintiff's intransigence did nothing to mitigate. The male French teacher who was not terminated was well qualified for his position, and the conclusion of several University committees that he was superior to plaintiff should not be overturned under these circumstances.
 
 
 26
 Accordingly, we affirm the district court's disposition of plaintiff's claim.
 
 
 
 [1]
 The Honorable William G. East, United States Senior District Judge for the District of Oregon, sitting by designation
 
 
 [2]
 If a "relatively less qualified" applicant for a job possessed qualifications significantly and obviously inferior to the person actually given the job, this rationale for adhering to the McDonnell model would be less persuasive. See generally Teamsters v. United States, 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Plaintiff's qualifications in this case were not significantly and obviously inferior to the male teacher retained by the University when she was fired
 
 
 [3]
 Thus, the University's reasons for nonretention of plaintiff, apparently presented in a stipulation of facts at the beginning of trial, can be used to show that the University had legitimate, nondiscriminatory reasons for plaintiff's termination
 
 
 [4]
 Although the trial court dismissed plaintiff's complaint for failure to establish a prima facie case, its analysis covered much more than the elements of proof required for a prima facie case under McDonnell. The trial judge stated that throughout the record there was ample proof provided by witnesses and documentation that nondiscriminatory considerations were the dominant reason for Dr. Davis' nonretention. Although the trial court did not expressly apply the correct legal standard when it dismissed plaintiff's complaint, the record developed in the trial court and the trial judge's explanation of his decision encompassed not only the first step of the McDonnell formula, but also the second and third steps. Thus, our holding that McDonnell applies to this case does not necessitate our vacating the district court's judgment and remanding this matter for new findings
 
 
 [5]
 Plaintiff offered statistical evidence to demonstrate that the University's employment practices had a discriminatory impact on women employees. The University presented evidence, including statistics, to rebut this contention. Plaintiff's statistical evidence, in light of the extremely small size of the relevant sample and the University's response to the evidence, is not persuasive