**Dr. Saeed GABALLAH,**
**Plaintiff-Appellant,**

v.

**Donald E. JOHNSON, et al.,**
**Defendants-Appellees.**

**No. 77–1084.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 4, 1977.

Decided June 17, 1980.

Rehearing Denied July 24, 1980.

George F. Galland, Jr., Chicago, Ill., for plaintiff-appellant.

Thomas P. Sullivan, U. S. Atty., Alexander D. Kerr, Asst. U. S. Atty., Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, CUMMINGS, Circuit Judge, and CAMPBELL, Senior District Judge.*

FAIRCHILD, Chief Judge.

Dr. Saeed Gaballah, an employee of the Veteran's Administration (VA), brought this lawsuit alleging a campaign of job discrimination against him by the defendants stretching from mid-1968 into 1975. Gaballah alleged that from 1968 to 1971 this course of discriminatory conduct was led by defendant Dr. I. James Young, then Gaballah's supervisor, and culminated in the abolition of Gaballah's GS-13 position through a reduction in force (RIF) procedure. When the RIF became effective on July 6, 1971, Gaballah was offered and accepted a GS-9 position under a different supervisor. Then, Gaballah alleged, defendants Dr. Gilbert Bogan, Dr. Ghonsham Sooknandan, and Dr. Jae Ro carried forward the campaign of discrimination by harassing him in his new position and by acting in concert with others to deny him opportunities for promotion to five positions which became available between November, 1972 and September, 1975.

Gaballah filed two lawsuits in the district court during this period, seeking relief from the defendants' alleged conduct. These suits were consolidated, the complaints were refined, and the case was tried before Judge Leighton without a jury. At the close of Gaballah's evidence the district court granted permission to file a Fourth Amended Complaint setting out two theories of liability: employment discrimination on the basis of nationality and religion in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*; and deprivation of property rights without due process in violation of the Fifth Amendment. Also at the close of Gaballah's evidence,[1] the district court took under consideration the defendants' motion under Rule 41(b), Fed.R.Civ.P., to dismiss the action for failure to show a right to relief. After both sides filed proposed fact findings and memoranda of law, the district court filed its findings and a memorandum opinion and granted judgment dismissing Gaballah's action against each of the defendants. We affirm.

I

Dr. Saeed Gaballah is an Egyptian and a Moslem. He came to the United States many years ago, obtained a Ph.D. in biochemistry from the University of Wisconsin, and became a citizen of the United States. In February, 1966, defendant Dr. I. James Young, M.D., Ph.D., hired Gaballah to establish and supervise a new Clinical Neuro-Chemistry Laboratory at Downey VA Hospital, Downey, Illinois. Young was the new Chief of the Neurology Service at Downey.

Gaballah began at Downey with a GS-12 salary grade to be paid from the hospital's clinical funds. His responsibilities included clinical neuro-chemistry tests, general supervision of his laboratory, and development and supervision of a new Radioisotope Laboratory. In addition, he was free to apply for research grants and spend some of his time conducting research. During Gaballah's first two years of employment at Downey his work proceeded smoothly and satisfactorily and he enjoyed a good working relationship with his colleagues. In addition, he and his wife socialized with the Youngs and attended dinners at Young's home. In July, 1967 Gaballah was promoted to the GS-13 salary grade.

---

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. Gaballah presented the testimony of six of his own witnesses and three adverse witnesses, in addition to his own testimony. He also introduced more than 350 documents as exhibits. The district court also admitted 40 additional documents presented by the defendants under Rule 106, Fed.R.Evid.

The seeds of Gaballah's disputes with the defendants were sown in December, 1967 when Gaballah filed a grievance against Young. Gaballah complained that Young had removed a technician from Gaballah's supervisory authority and had discouraged Gaballah from submitting an independent research grant proposal. Young responded that supervision of particular employees must remain under Young's ultimate control as Chief of the Neurology Service and that Gaballah was free to submit grant proposals as long as the research work did not interfere with his duties as head of the Clinical Neuro-Chemistry Laboratory. P.Exh. 12.

In June, 1968 another dispute arose when Young recommended withholding Gaballah's annual within-grade pay increase. Young asserted that Gaballah had failed to keep sufficient records in the Radioisotope Laboratory and to keep Young informed of the work being done in the Neuro-Chemistry Laboratory. P.Exh. 19. Gaballah sought reconsideration of Young's recommendation by the Hospital Director, Dr. Bourke. After discussing the matter with Young and Gaballah, Bourke set aside Young's decision on the ground of insufficient warning. P.Exh. 25.

Following this settlement of the salary increase dispute in August 1968, Gaballah said a cordial working relationship with Young was reestablished. Tr. 1282–83. In the spring of 1969 Gaballah submitted a proposal for research funding to study a nervous system chemical called Cyclic-AMP. The proposal was approved by Young and the Downey Research and Education Committee (REC) and submitted to the VA Central Office for allocation of Part I funds.[2] The proposal requested funding for five years of research. In July, 1969, the VA Central Office approved funding of Gaballah's Cyclic-AMP research for two years from July, 1969 to June, 1971. By mid-1969 Gaballah's activities at Downey were almost exclusively research oriented.

Late in 1969 Gaballah complained to the Chief of Staff at Downey, Dr. Raulinaitis, that Young was favoring other researchers in the Neurology Service, Dr. Irene Held and a chemist, James Custod, and that Young had taken over direct supervision of the technicians and chemists in the Neuro-Chemistry and Isotope Laboratories. Raulinaitis told Gaballah that as Chief of Neurology, Young had the authority to do these things and Gaballah "had better make peace with him." Tr. 777. She also warned Gaballah that the hospital could close the Clinical Neuro-Chemistry Laboratory at any time.

In the spring of 1970 another dispute arose. Young attempted to put together a composite research program involving the entire Neurology Service. Each researcher, including Gaballah, was to investigate a particular topic within the composite program. Young planned to submit the composite proposal for Part I funding. At the same time Gaballah obtained Young's permission to formulate and submit a Part II proposal. When Gaballah drew up his proposal, however, Young concluded that it was the same as Dr. Held's topic in the composite program and asked Gaballah to withdraw his proposal. Gaballah suggested that they allow the REC to resolve any conflict between his proposal and Held's topic and Young agreed. The next day Young reversed himself and told Gaballah he would not give the approval of the Part II proposal needed to allow the REC to act on it. About the same time Young held a meeting of the people involved in the composite program, except Gaballah, and the group decided to exclude Gaballah from the program.

Also during this period Gaballah served on a REC sub-committee which reviewed new grant proposals and progress reports from ongoing projects and made recommendations to the REC. In April 1970 the sub-committee returned a series of Young's progress reports to him, requesting correc-

2. At that time VA research projects could be funded through "Part I" funds coming directly from the central office in Washington, or through "Part II" funds, allocated in lump amounts to the individual hospital for allocation by the hospital REC.

tions on some and indicating that three reports, on projects involving Custod, appeared to show no progress at all.

In June, 1970 Gaballah filed a grievance complaining about Young excluding him from the composite program and disapproving the Part II proposal. The written grievance was labelled "discrimination" and contains an assertion that Young's conduct amounted to "professional discrimination." P.Exh. 82.[3] Young responded that Gaballah's Part II proposal conflicted with Held's composite program topic and that the others involved in the composite program had agreed to exclude Gaballah because his lack of cooperation was inconsistent with the "collegiality" necessary to the program. Young also said he felt it necessary to redirect Gaballah's activities back toward the clinical responsibilities for which he was hired. P.Exh. 83, p. 2. Hospital Director Bourke found Gaballah's grievance unjustified on the ground that Young's actions were within his authority and that Gaballah should devote more time to clinical duties because his salary came from the hospital's clinical funds. P.Exh. 84.

In July, 1970 Gaballah filed another written grievance, again labelled "discrimination," raising the same issues as the June grievance. Gaballah met with Raulinaitis to discuss the matter and at her request withdrew his grievance with assurances that he could submit a request for renewal of the Cyclic-AMP project which would cover his entire salary from research funds. Tr. 873.

In December, 1970, Young filed his budget requests for the Neurology Service and disapproved renewal of funds for Gaballah's Cyclic-AMP project. P.Exh. 91. Gaballah submitted his renewal proposal to the REC and complained to Bourke, but both declined to act without Young's approval. P.Exhs. 92–96. Then on January 15, 1971, Gaballah received a memorandum from Bourke notifying him that the hospital planned to abolish the Clinical Neuro-Chemistry Laboratory effective June 30, 1971 and that Gaballah would be subjected to a RIF P.Exh. 108. Gaballah filed a grievance on January 28, 1971, asserting that the refusal to renew his research was done on a "personal basis," and requested a hearing.[4] P.Exh. 117.

The VA appointed a hearing officer and a hearing was held on March 2, 1971. Gaballah hired an attorney to represent him at the hearing. Tr. 1112–13. At the opening of the hearing, the hearing officer instructed the parties to raise all allegations related to the grievance. The parties presented evidence on the issue of whether Gaballah's renewal request for the Cyclic-AMP project had been considered by the proper authorities and whether the procedure followed in notifying Gaballah of the probable RIF was correct. Gaballah raised no allegations of discrimination based on religion or nationality. Tr. 1113–14.

The hearing officer issued three findings on March 22: that Gaballah's research renewal proposal should have been considered by the REC; that Young's disapproval of the proposal was not based on personal bias; and that the required procedures were not followed in notifying Gaballah that his position would be abolished. On April 16 Bourke reversed the decision of the hearing officer. He found that Young properly exercised the authority to disapprove Gaballah's renewal proposal and that in refusing to consider the proposal without Young's approval, the REC had in effect acted on the proposal Bourke also found that, although the notice of probable RIF was improperly stated in definite terms, the intent had been to give Gaballah as much notice as possible and, therefore, the notice should stand. P.Exh. 138. On June 28, 1971, the defendant Administrator of the VA affirmed Bourke's ruling. P.Exh. 157.

---

3. The grievance did not mention discrimination on the basis of religion or nationality.

4. During this period Gaballah also contacted members of Congress seeking assistance. In a letter to Senator Stevenson, Gaballah described his troubles with Young as "personality differences." P.Exh. 111.

The Regional Medical Director of the VA approved the RIF on May 28, 1971. P.Exh. 145. On June 4, Gaballah received written notice that the RIF would take effect on July 6, 1971. Subsequently, Gaballah accepted an offer of a demotion to a GS–9 chemist position in the Laboratory Service at Downey, in lieu of separation.

On July 19, 1971, Gaballah appealed the RIF to the Regional Office of the Civil Service Commission (CSC), claiming he had not been offered an appropriate research position and had been placed in a position formerly designated GS–11, but was being paid as a GS–9. P.Exh. 162. The Regional Office denied Gaballah's RIF appeal on September 29, 1971. The decision recites that an investigation of the facts of the RIF was conducted to determine if any of Gaballah's rights under the RIF regulations had been violated. The decision also notified Gaballah of his right to appeal to the CSC Board of Appeals and Review (BAR). P.Exh. 177. No appeal was taken. Tr. 1138–39.

While his RIF appeal was pending, on August 7, 1971, Gaballah filed his first Equal Employment Opportunity complaint alleging that the termination of his research funding and the RIF were motivated by discrimination based on religion and nationality. P.Exh. 168. The VA Office of General Counsel rejected the complaint as untimely on the ground that both the research funding and the RIF were considered in the March 2 grievance hearing and Gaballah failed to allege religious or ethnic discrimination in that proceeding. P.Exh. 183. Gaballah retained counsel in Washington, D.C., and appealed to the CSC BAR. On April 26, 1972, the BAR upheld the VA's decision. P.Exh. 234. Gaballah filed his first civil action in the district court on August 9, 1972, alleging that the termination of his research funding and the RIF constituted discrimination on the basis of his race, religion, and nationality.

The remaining facts relate to a second and separate phase of the campaign of discrimination alleged by Gaballah. When the RIF took effect in July, 1971, Gaballah assumed his new position in the Laboratory Service under the defendant Dr. Ghonsham Sooknandan, M.D., the Chief of that Service. Young made plans to transfer his research projects and most of the personnel in the Neurology Service to another VA hospital and accomplished the move by the beginning of 1972. The defendant Dr. Gilbert Bogen, M.D., replaced Raulinaitis as Chief of Staff at Downey during 1971. According to Gaballah he got along well with Sooknandan and received no complaints or criticism for the first year in the Laboratory Service.

Young's departure created a number of openings in the Neurology Service, yet no one in the hospital management consulted Gaballah or offered him a position in their attempts to reorganize that Service. Then, beginning in the spring of 1972, several incidents occurred involving Bogen which Gaballah claims show discriminatory motivation. First, after the Cyclic-AMP grant expired in June, 1971, Gaballah applied for funding to transfer the project to the same VA hospital where Young moved. An official of the VA Central Office suggested that Gaballah renew the project at Downey once Young left. Gaballah obtained approval from the Downey REC, provided that Bogen and the hospital director found it "appropriate." P.Exh. 235. Without giving Gaballah any reason, Bogen declined to forward the proposal to Washington.

Bogen also sent several memos to various hospital officials asserting that Gaballah was performing poorly, was engaging in unauthorized research (continuation of his terminated Cyclic-AMP project),[5] and had a poor attendance record. See e. g. P.Exhs. 226, 240, 244. Sooknandan responded to Bogen's memos of March 7 and June 8, 1972, stating that considering Gaballah's research orientation, his performance in the

---

**5.** Although the district court made no finding on this point the record supports Bogen's assertion that Gaballah continued to work on the Cyclic-AMP project long after it was officially terminated in June, 1971. See e. g. P.Exh. 235; Tr. 602–12; cf. Tr. 1110–1111.

Laboratory Service was satisfactory. P.Exhs. 228, 242. Bogen also directed the Personnel Service to audit Gaballah's activities and attendance and that Gaballah keep a log of his daily activities. P.Exhs. 243, 249, 251.

After Gaballah filed his first lawsuit in August, 1972, Sooknandan began to take a harder position and wrote memos criticizing Gaballah's performance and attendance. P.Exhs. 258, 262, 271. Sometime during this period, according to Gaballah, Sooknandan told him that the "Jews" in the front office were "after" him. Tr. 935. In February, 1973, Bogen assigned Mladen Djuricich to supervise Gaballah in the Laboratory Service, despite the fact that, like Gaballah, Djuricich was a GS–9.[6] On February 12 Gaballah filed a grievance objecting to the log book requirement and supervision by Djuricich. P.Exh. 261. The new hospital director, Dr. Aaron Mason, M.D., rejected the grievance on the ground that the log book was necessary due to serious questions about Gaballah's productivity and that Djuricich had been made Chief of the Chemistry Section of the Laboratory Service. P.Exh. 268. Gaballah's job description was amended to reflect the new supervisory arrangement.[7] Although his February 12 grievance made no mention of discrimination, on March 16, 1973 Gaballah filed his second EEO complaint, alleging that the log requirement and supervisory arrangement, as well as his lack of research funding, were motivated by ethnic and religious discrimination. P.Exh. 269. An administrative investigation found no evidence of the alleged discrimination. In October, 1973 Gaballah filed his second lawsuit in the district court which was later consolidated with the earlier case.

In June, 1972, defendant Dr. Jae Ro, M.D., replaced Sooknandan as Chief of the Laboratory Service. On August 2, Ro wrote a memo, based on information from others, describing Gaballah's performance as "very satisfactory" and "fully acceptable." P.Exh. 287. After receiving instructions from Bogen to fire Gaballah, Ro wrote several memos critical of Gaballah's performance and attendance. P.Exhs. 289, 294, 295, 308. In addition, sometime in 1973, Bogen notified authorities and several potential victims of an alleged threat by Gaballah on the lives of several Jewish officials at Downey. Bogen also said he had heard that Gaballah belonged to an Arab terrorist organization. The district court found that Bogen's reports were "a misconstruction of the facts that gave rise to [them]." Dist.Ct.Findings, ¶ 31.

The foregoing facts were introduced to serve as background and to show the motivation for the main acts of discrimination alleged by Gaballah in the post-RIF period. Between November, 1972 and September, 1975, five positions became available at GS–11 or 12 levels.[8] The details of the filling of these jobs need not be recited. The defendants concede that Gaballah was qualified for each job; that having been demoted in a RIF, he had a right under the VA regulations to be considered for each position before the job was posted and to receive written reasons if he was not selected; and that he did not receive the required prior consideration or written reasons.

Responsibility for affording Gaballah these promotion consideration rights rested with the Personnel Service. According to Warren Gleason, who took over as Chief of the Personnel Service at Downey in January, 1974, both he and the staff of the

---

**6.** The evidence indicates that such an arrangement was permitted under personnel regulations, though usually for short periods. Tr. 198 99. Djuricich remained Gaballah's supervisor for two years as a GS–9. Djuricich was then promoted to GS–11 and given one of the positions Gaballah claims he should have been considered for (discussed *infra*).

**7.** When Gaballah was transferred to the Laboratory Service his job description contemplated

that after some training he would be promoted and assume responsibility for the Chemistry Section. This provision was deleted at Mason's direction on March 9, 1973. P.Exh. 267. As noted above, Djuricich was placed in the position originally intended for Gaballah.

**8.** One of these was the promotion of Djuricich to GS–11 in May, 1975 to reflect the position of Chief of the Chemistry Section he assumed in 1973. *See* nn. 6 & 7, *supra.*

Personnel Service had been unaware of Gaballah's rights under Downey's Merit Promotion Program until they were disclosed through discovery just prior to trial in 1976. Tr. 412–13. The district court found that "[n]one of the defendants was involved in the decisions or actions that denied [Gaballah] preferential consideration for these positions." Dist.Ct. Findings, ¶ 40. The court also found that neither Gleason nor any of his staff were motivated by racial, ethnic, or religious discrimination. *Id.* In addition, in its conclusions of law the district court summarized its fact findings by holding "that no person who dealt with [Gaballah] in matters affecting his rights as a federal employee deprived him of any procedural right nor discriminated against him because of his race, national origin, or religion." Dist.Ct.Concl., ¶ 3.

## II

In his Fourth Amended Complaint, Gaballah alleged that these facts supported liability of both the individual defendants and the Administrator of the VA in his official capacity under Title VII (Count I)

and of the individual defendants alone under the due process clause of the Fifth Amendment (Count II). Since the facts underlying Gaballah's claims also fall into two discrete segments, the RIF and the post-RIF period, four separate claims emerge. We will consider each one separately.[9]

### A. The RIF Title VII Claim

▉▉ Title 42 U.S.C. § 2000e–16(c) requires that a civil action under Title VII by a federal employee must be filed "[w]ithin thirty days of receipt of notice of final action taken by . . . the Civil Service Commission . . . on a complaint of discrimination . . . ." This requirement is jurisdictional. *Hofer v. Campbell,* 581 F.2d 975 (D.C.Cir. 1978), *cert. denied* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979); *Eastland v. Tenn. Valley Auth.,* 553 F.2d 364, 368 (5th Cir.), *cert. denied* 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977). The record shows that Gaballah received the final decision of the CSC BAR denying review of his RIF claim on or about April 26, 1972.[10] P.Exh. 234; Tr. 1150. His first

9. In his memorandum opinion, Judge Leighton held that the post-RIF Title VII claims were barred by failure to exhaust administrative remedies and that the entire due process count was barred under *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (Title VII exclusive remedy in federal employment discrimination cases), and under the doctrine of sovereign immunity. The parties have devoted large portions of their briefs to these issues. Because we have concluded that the district court's judgment must be affirmed on other grounds present in Judge Leighton's findings and conclusions and in the record, we need not discuss these issues.

10. The BAR's April 26, 1972 decision did not contain notice of Gaballah's right to sue within thirty days. We are aware that some courts have held that the thirty days does not begin to run until both notice of the decision and of the right to sue within thirty days are received. *See e. g., Mahroom v. Hook,* 563 F.2d 1369, 1374 76 (9th Cir. 1977), *cert. denied* 436 U.S. 904, 98 S.Ct. 2234, 56 L.Ed.2d 402 (1978); *Allen v. United States,* 542 F.2d 176, 178–80 (3d Cir. 1976); *Coles v. Penny,* 531 F.2d 609, 613 ·17 (D.C.Cir. 1976). The rationales for these decisions vary somewhat, but basically they rely on two points: the regulations adopted by the CSC to implement the 1972 amendments to

Title VII which extended the right to sue to federal employees, *see Mahroon v. Hook, supra; Allen v. United States, supra,* and the unfairness of foreclosing a Title VII remedy to a *pro se* complainant where the complainant is not warned of the 30-day limitation, *see Coles v. Penny, supra.* Indeed, the court in *Coles* concluded that a requirement of notice of the 30-day limit should be implied in the statute itself for these reasons. On the other hand, the Fifth Circuit has refused to follow *Coles* and held that failure to comply with the 30-day rule bars a court suit even where the CSC's decision lacking notice of the 30-day rule was issued after December 1, 1972, the effective date of the CSC regulation requiring such notice. *Eastland v. T.V.A., supra.*

The facts of this case do not require excusing Gaballah's failure to file his suit within 30 days. The CSC regulations requiring notice had not yet been promulgated. Moreover, Gaballah was represented by counsel and a copy of the CSC decision was sent to counsel. The language of § 2000e–16(c) was clear and did not require notice of the 30-day limit. Thus, at least on the facts of this case, there is no reason to depart from the general rule requiring strict adherence to statutory time limits. *Eastland, supra; Coles, supra,* 531 F.2d at 613 n. 12.

complaint was filed on August 7, 1972, more than thirty days after the notice of final administrative action. Therefore the RIF Title VII claim was untimely and was properly dismissed.[11]

## B. *The RIF Due Process Claim*

Gaballah argues that he has a claim under the Due Process Clause distinct from his Title VII claim. His theory is that the RIF was improperly used to demote him for disciplinary reasons, thus violating VA regulations requiring a hearing before imposing disciplinary sanctions. *See e. g. Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). To the extent this claim is separable from the Title VII claim, however, it is barred by Gaballah's failure to exhaust administrative remedies.

Federal employees claiming denial of due process rights through violation of administrative regulations must exhaust available administrative remedies. *Penn v. Schlesinger*, 497 F.2d 970 (5th Cir. 1974) (*en banc*), *adopting dissenting op.*, 490 F.2d at 707–714, *cert. denied sub nom. Penn v. Rumsfield*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976); *Allen v. Butz*, 390 F.Supp. 836, 839 (E.D.Pa.1975); *cf. Sampson v. Murray*, 415 U.S. 61, 74, 94 S.Ct. 937, 945, 39 L.Ed.2d 166 (1974) (courts have no authority to review claims under *Service v. Dulles, supra*, until after exhaustion of administrative remedies; case involved injunctive relief). And the exhaustion requirement applies with extra force where relief at the agency level might obviate claims against individual federal officials. *Penn v. Schlesinger, supra*, 490 F.2d at 713–14.

In this case Gaballah appealed the RIF to the Regional Office of the CSC. When the Regional Office rejected his appeal, he had a right to appeal to the BAR. *See* 5 C.F.R. § 772.307 (1973). Gaballah did not appeal to the BAR. Thus he failed to exhaust available administrative remedies and is barred from bringing to the courts his claim that the RIF violated the applicable regulations. *See Haynes v. United States*, 418 F.2d 1380, 1382 (Ct.Cl.1969).[12] The district court was therefore correct in dismissing Gaballah's RIF due process claim.

## C. *The Post-RIF Title VII Claim*

As to this claim we must consider the merits of Gaballah's contention that the proof he presented established a *prima facie* case under Title VII. Relying on *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

11. The defendants have not pressed the timeliness issue on appeal. Since the thirty day limit is jurisdictional, however, we are required to consider the issue *sua sponte*. *Rice v. Rice Foundation*, 610 F.2d 471, 474 (7th Cir. 1979); *cf. In re Cons. Pretrial Proc. in the Airline Cases*, 582 F.2d 1142, 1151 (7th Cir. 1978) (former 90 day limit in private employer cases was jurisdictional and could be raised at any point in the litigation). The record shows that in ruling on the defendants' motion to dismiss the third amended complaint, Judge McGarr held that Gaballah had "complied with the prerequisites of 42 U.S.C. § 2000e 16(c)." O.R., Vol. II, Doc. 78, p. 6. On the first day of trial, the defendants again raised the issue of timeliness by amending their answer to add it as an affirmative defense. *Id.*, Doc. 115. Judge Leighton does not appear to have expressly considered this issue and the defendants seem to have abandoned the point by concurring in Gaballah's proposed finding of fact No. 33. *Compare id.*, Doc. 125, p. 9, ' 33 *with id.*, Doc. 135, p. 6, ' 33. In any event, Judge Leighton concluded that he had jurisdiction over the Title VII claims under, *inter alia*, § 2000e–16(c).

Dist.Ct.Concl., ' 1. As we have explained, as to the RIF Title VII claim we disagree.

12. It is not clear that Gaballah presented his due process claim in its present form even in the CSC Regional Office appeal. His written appeal claims only that he should have been transferred to a research position following the RIF and that he should have received a GS–11 rating in the position he actually accepted. P.Exh. 162. His claim now is that the RIF itself violated the regulations because it was used to punish him without following the procedures required for disciplinary action. The decision of the Regional Office, however, does recite that the facts of the RIF were investigated "to determine if any of [Gaballah's] rights under the RIF regulations were abridged." P.Exh. 177. In any event, as shown in the text, to the extent that this claim was presented at any administrative level, Gaballah's failure to present it to the BAR amounted to a failure to exhaust his available administrative remedies. *Haynes v. United States, supra*.

93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), Gaballah contends that he established a *prima facie* case with undisputed proof "(a) that he was an Arab, (b) that he was qualified for promotion to each of the five vacancies, (c) that he was not selected, and (d) that the vacancies were filled with non-Arabs." Appellant's Br. at 25. Gaballah concludes that this showing alone required the defendants to go forward with rebuttal evidence and precluded the district court's Rule 41(b) dismissal.

■ But as the Court in *McDonnell Douglas* warned: "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. And more importantly, the *McDonnell Douglas* opinion goes on to provide two more steps in its guidelines for analysis of Title VII cases. Once the plaintiff has presented the minimal proof needed to make out a *prima facie* case allowing an inference of discriminatory motive for the defendant's action, the defendant has the burden of showing a non-discriminatory reason for the action. If the defendant provides such a reason, the third step shifts the ultimate burden of proof back to the plaintiff. The plaintiff must then prove that the reason stated by the defendant is a pretext and that the true motivation for the defendant's conduct is prohibited discrimination. This court has recognized recently that *McDonnell Douglas* "is merely a model for ordering and evaluating evidence concerning employment discrimination." *Davis v. Weidner*, 596 F.2d 726, 730 (7th Cir. 1979). As in the present case, the district court in *Davis* dismissed a Title VII suit at the close of the plaintiff's evidence. We affirmed the dismissal, notwithstanding our holding that *Davis* had "satisfied the *McDonnell* requirements for a prima facie showing of employment discrimination." *Id.* This was possible because the record produced by the plaintiff's proof and the trial judge's decision "encompassed not only

the first step of the *McDonnell* formula, but also the second and third steps." *Id.* at n. 4. *See also Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1281–82 (7th Cir. 1977).

■ Thus Gaballah's basic contention that a showing of a *prima facie* case under Title VII precluded dismissal at the close of his evidence must fail. Assuming *arguendo* that he established a *prima facie* case as to the post-RIF non-promotions, the district court was free to proceed to the remaining steps of the *McDonnell* analysis and determine the ultimate issue of whether Gaballah had shown the defendants' reasons to be pretexts for actual discriminatory motivation.

Gaballah argues on appeal that Judge Leighton's decision on this claim depends solely on his finding that Gaballah failed to exhaust his administrative remedies.[13] But here as in *Davis v. Weidner, supra*, the evidence in the record and the district court's findings and conclusions encompass all three steps in the *McDonnell Douglas* analysis. The district court found as its ultimate conclusion relevant to the Title VII claims that "no person who dealt with [Gaballah] in matters affecting his rights as a federal employee . . . discriminated against him because of has race, national origin or religion." Unless clearly ·erroneous, this finding is fatal to Gaballah's Title VII claim.

The post-RIF Title VII claim involves five job openings. Gaballah asserts he was entitled to prior consideration and written reasons for non-selection for each position. He concludes that the selection of another applicant for each position was discriminatorily motivated. Since the district court held that Gaballah failed to show a *prima facie* case, it did not expressly consider whether the evidence showed non-discriminatory reasons for selecting others for these positions. From the evidence in the record and the district court's findings, however, we are able to discern the explanations offered by the defendants. *See Davis v. Weidner, supra*, 596 F.2d at 730 n. 4.

---

**13.** The parties agree that this finding was in error.

As to two of the positions, the defendants responded that Gaballah was not considered because the jobs were part-time, temporary appointments. Tr. 305, 317–18. Although the district court found that both positions were later converted to full-time, permanent appointments, the defendants' reason for not considering Gaballah remains facially non-discriminatory.

The reason articulated for elevating Djuricich rather than Gaballah to the position of Chief of the Chemistry Section of the Laboratory Service was that Djuricich had been performing that function for two years by the time the position was created. This too is a non-discriminatory reason, sufficient to shift the burden back to Gaballah to show that it was a pretext.

As to the remaining two positions, at most the evidence indicates that the position descriptions were tailored to assure the selection of particular individuals and that these individuals had been selected by the selecting officials before the positions were even approved for creation by the Downey Position Management Committee. Thus the selecting officials may have chosen someone other than Gaballah for these positions prior to a point in time when a choice between Gaballah and a "non-Arab" could have arisen.[14]

This leads us to the final step in the *McDonnell Douglas* analysis—the ultimate question whether Gaballah proved that the non-promotions were discriminatorily motivated. The district court held he did not. Gaballah points to evidence in the record which could support a finding of discrimination. But there is substantial evidence supporting Judge Leighton's finding as well.

Severely undercutting Gaballah's theory of discrimination by the named defendants and a few others is the fact that the creation, definition, and filling of the positions in issue was done pursuant to the recom-

mendations and approval of two committees. *E. g.* Tr. 268, 317–18, 320. The Position Management Committee included the heads of several of the hospital services and several "rotating ad hoc members from other services." Tr. 248–249. Most of these members have not been alleged by Gaballah to have acted out of discriminatory motivation. The other committee in part responsible for the creation and filling of these positions, the REC, included at various times at least some members Gaballah appears to regard as favorable to him, *e. g.* Drs. Kenfield and Breen and Mr. Weinstein. *See* Tr. 419, 574, 583, 1187; P.Exh. 229. In addition, three of the selecting officials responsible for the actual hiring decisions challenged by Gaballah are not alleged to have discriminated, nor are they even mentioned in the Fourth Amended Complaint filed after the close of Gaballah's proof. We have found no evidence of discrimination by these officials in the record.

Finally and most importantly, the district court's finding of no discrimination is based on its opportunity to assess the credibility of the witnesses presented by Gaballah. The district court took the opportunity to ask several of the witnesses, including the three adverse witnesses,[15] whether they or anyone they had observed had dealt with Gaballah out of discriminatory motives. Each of the witnesses said no. *See* Tr. 238–39, 411–13, 684–85, 707–08. Furthermore, Gaballah was on the stand for about a day and a half. Thus Judge Leighton had ample time to assess Gaballah's credibility and evaluate the soundness of Gaballah's conclusion that he was a victim of discrimination.

For these reasons we are unable to say that the district court's finding of no discrimination is clearly erroneous. Consequently the dismissal of the post-RIF Title VII claim must be affirmed.

14. Such pre-selection would violate the rules of Downey's Merit Promotion Program. P.Exh. 347, ' 2(h). But a violation of that rule does not indicate discrimination against Gaballah. Indeed, pre-selection would indicate that no decision between candidates was made at all. Thus, although this explanation of the non-se-

lections amounts to a violation of another rule, it remains a non-discriminatory reason under the *McDonnell Douglas* analysis.

15. One of the adverse witnesses was defendant Bogen.

**1202**

## D. *The Post-RIF Due Process Claim*

In his brief, Gaballah asserts that he established a *prima facie* case of violations of his due process rights with his evidence of both the alleged harassment by the defendants Bogen, Sooknandan, and Ro following the RIF and the irregularities in filling the five post-RIF job vacancies. He bases this claim on the Fifth Amendment due process clause, relying on the due process theory from *Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), and *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). And for his asserted federal cause of action, he relies on the rationale of *Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

In affirming the district court's dismissal of this claim, we need not consider many of the issues raised by a *Bivens* due process action in, the federal employment area. We may assume *arguendo* that such a cause of action exists and proceed to the usual due process analysis.

■ It is now thoroughly settled that due process claims are assessed under "a two step analysis. Initially, it must be determined whether [Gaballah's] interest rises to the level of a constitutionally protected 'liberty' or 'property' interest." *Larry v. Lawler*, 605 F.2d 954, 957 (7th Cir. 1978) (Fifth Amendment claim in federal employment setting). Only if Gaballah has shown that the defendants interfered with such a liberty or property interest, does the analysis go on to consider what procedures are required and whether the defendants have violated such procedures. *See McElearney v. Univ. of Illinois*, 612 F.2d 285 (7th Cir. 1979)(due process claim by non-tenured college professor).

■ Under this analysis most of the defendants' alleged improprieties did not interfere with any liberty or property rights of Gaballah. The alleged course of harassment did not deprive Gaballah of his civil service position and he has alleged no other interest which could be classified as property. And the various allegations against Gaballah made or circulated by the individual defendants did not infringe any liberty interest, since Gaballah's evidence does not show any injury to "some more tangible interests such as employment" to couple with the possible injury to his reputation. *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160–1161, 47 L.Ed.2d 405 (1976); *cf. Larry v. Lawler, supra*, 605 F.2d at 958.

■ Regarding the five non-promotions, the evidence in the record shows that Gaballah had no protected right to be promoted under the Downey Merit Promotion Program. No does Gaballah have a property interest in any particular form of consideration for promotion. For if a non-tenured college teacher could assert no property interest in the decision whether to rehire him for a position he already held, *Bd. of Regents v. Roth*, 408 U.S. 564, 577–78, 92 S.Ct. 2701, 2709, 2710, 33 L.Ed.2d 548 (1972), Gaballah has no such interest in the filling of positions he has never held. His claims are similar to that of the non-tenured assistant professor in *McElearney v. Univ. of Illinois, supra*, who claimed his due process rights had been denied when the faculty promoted others to tenured positions and refused to renew his contract. There, although the University provided rules and an appeals procedure for non-promotion, we affirmed the district court's holding that the non-promotion and refusal to rehire violated no property right of McElearney. That holding ended the due process analysis in *McElearney*, 612 F.2d at 291 (Appendix); the same is true here.[16]

■ Moreover, not every violation of agency rules gives rise to a cause of action under *Accardi* and *Service*. Where "[t]he [violated] rules were not intended primarily to confer important procedural benefits upon individuals" the courts have refused to find a due process violation. *American Farm Lines v. Black Ball*, 397 U.S. 532, 538–39, 90 S.Ct. 1288, 1292–93, 25 L.Ed.2d

---

16. Gaballah has not alleged and the record does not show that the non-promotions in any way interfered with his liberty. *See Roth, supra*, 408 U.S. at 573 -75, 92 S.Ct. at 2707-2708.

547 (1970); *Silverman v. CFTC*, 549 F.2d 28, 33–34 (7th Cir. 1977). Most of the promotion rules allegedly violated by the defendants are general policy guidelines which create no personal rights, either substantive or procedural, for Gaballah. For example, the alleged violations of the rules by misclassifying several of the positions and by pre-selecting candidates in two cases did not infringe on any interest particular to Gaballah and protected by the rules. Those rules protect only the generalized interest in filling positions with the best qualified personnel in the agency. This interest belongs as much to the agency and the public in general as it does to Gaballah. Thus violations of rules such as these do not support a due process claim.[17]

What we have said so far does not apply, however, to the failure of Downey officials to afford Gaballah preferential consideration for the five promotions outside the normal promotion rules discussed above. As the district court found, Downey's rules provided that an employee demoted after a RIF must receive prior consideration for promotions for which he is qualified. Further, the selecting official must provide written reasons for deciding not to select such an employee. Clearly such rules "confer important procedural benefits upon individuals." *American*

*Farm Lines, supra.* Moreover, these rules might be viewed as creating a legitimate claim of entitlement to promotion absent the articulation of some valid written reason for non-selection. *See Roth, supra.* Thus we will assume that the failure to follow such rules violated Gaballah's property rights.

Reversal is not required on this point, however, because the district court held that none of the named defendants was responsible for providing Gaballah with preferential consideration. Gaballah has not argued on appeal that this finding is clearly erroneous. The finding is based on the uncontradicted testimony of Warren Gleason, the present Chief of Downey's Personnel Service. Gleason said that under Downey's rules, the Personnel Service was solely responsible for keeping track of Gaballah's right to preferential consideration and forwarding his name to the appropriate selecting officials for such consideration. *See e. g.* Tr. 331, 339–40, 371–72.[18] Gaballah's post-RIF due process claims are directed solely at the individual defendants Bogen, Sooknandan, and Ro. Since the district court's finding that these officials had nothing to do with denying Gaballah preferential consideration for the five promotions is not clearly erroneous, the dismissal of this claim must by affirmed as well.[19]

---

**17.** Nor does the evidence show that any of the responsible selecting officials failed to exercise their discretion due to outside influence, *see Accardi, supra; American Farm Lines v. Black Ball, supra*, 397 U.S. at 539, 90 S.Ct. at 1292, or that any such official acted out of improper motives in choosing persons other than Gaballah, *see* Part II C, *supra; cf. Bd. of Regents v. Roth, supra*, 408 U.S. at 575 n. 14, 92 S.Ct. at 2708 n. 14.

**18.** In his brief Gaballah asserts that this testimony does not apply to the failures to give preferential consideration as to the two jobs filled prior to Gleason's employment. Gleason's testimony described the rules governing the responsibilities of the Personnel Service, however, and neither Gaballah, nor the evidence, suggest that the responsibility lay elsewhere prior to Gleason's employment.

In his reply brief Gaballah argues further that Gleason's testimony that he was unaware of the preferential consideration rules does not absolve the individual defendants if they knew

or should have known of the rules. This argument misses the point that Gleason's testimony also established that the defendants were not responsible for and had no part in securing or denying preferential consideration. Moreover, the record shows no evidence that these defendants knew or should have known of these rules. Indeed, it appears that most selecting officials may have been ignorant of these rules, since prior to the RIF Gaballah himself was a selecting official for several positions and he obviously did not know of these rules.

**19.** In his brief Gaballah asserts that the due process claim in Count II of the Fourth Amended Complaint was limited to a damage claim against the individual defendants because sovereign immunity barred any relief against the VA for such a violation. He points out that the sovereign immunity bar has been removed as to equitable relief, by the 1976 amendments to 5 U.S.C. § 702. He therefore says that if the case were remanded he would seek to amend his due process claim "to seek injunctive relief

## III

For the reasons we have stated as to each of the claims alleged in the Fourth Amended Complaint, the judgment of the district court dismissing this action is affirmed and the Clerk of this court is directed to enter judgment accordingly.

against the VA ordering his reinstatement *to the position he lost.*" Appellant's Br. at 31 n. 11 (emphasis added). This proposed amendment, however, apparently would seek relief under the RIF due process claim. In Part II -B, *supra,* we held that claim barred by Gaballah's failure to exhaust available administrative remedies. Moreover, even under the preferential consideration rules, Gaballah cannot establish any absolute right to a promotion. Since he had no right to receive any particular promo-tion and since the five jobs at issue here have been filled, the most Gaballah could receive as equitable relief against the VA under the post-RIF claims would be some form of injunction enforcing his future rights to preferential consideration. And since the Downey rules, which have now been brought to the attention of Downey's Personnel Service, already provide that right, we see no reason to remand the case for further proceedings on that point.