**John H. WARRICK, Plaintiff,**

v.

**Samuel R. PIERCE, Secretary of Housing and Urban Development, Defendant.**

**No. IP 78–618–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 5, 1983.

Frederick Work, Gary, Ind., and Yvonne Watkins, Indianapolis, Ind., for plaintiff.

Bradley Williams, Asst. U.S. Atty., Indianapolis, Ind., for defendant.

## MEMORANDUM

STECKLER, District Judge.

This cause came before the Court for trial on January 11 and 12, 1982. The Court having considered the evidence, the post-trial briefs and oral arguments of the parties, together with the proposed findings of fact and conclusions of law, and being fully informed in the premises, finds and concludes that the evidence and the law are with the defendant and against the plaintiff. The Court now makes this memorandum preparatory to the adoption of findings of fact and conclusions of law.

This action was brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), prohibiting employer discrimination on the basis of race, §§ 2000e–5(h)(1) and (3) authorizing an individual claiming discrimination to bring suit after exhausting his administrative remedies, and § 2000e–16 prohibiting discrimination in hiring and promotion by government agencies, and which incorporates the judicial review provisions of § 2000e–5.

Plaintiff at trial centered his claim of discrimination upon his unsuccessful attempts to gain promotions respecting the following positions: (1) Special Assistant to Area Director, (2) Supervisory Realty Specialist, (3) Single-Family Services Officer, and (4) Equal Opportunity Officer. As to the position of Special Assistant to the Area Director, from the evidence it is unclear

whether plaintiff actually applied for this position. There was evidence that the position was not filled by merit staffing but by a lateral transfer.

Plaintiff contends that he was denied the promotions in question because of his race, and that evidence of intent to discriminate exists circumstantially by (1) the use of "details" to fill temporarily vacant positions, (2) the refusal of plaintiff's superiors to grant him supervisory training, (3) the racial animus held by plaintiff's superiors, and (4) the use of statistics contained in the Civil Service Commission Appeal Board Decision.

Plaintiff contends that the Indianapolis HUD Area Office's use of details resulted in a form of pre-selection in that the detailee ultimately received the promotion. The evidence indicates that on occasion the Area Office departed from the Civil Service merit staffing procedures which required that detailing of employees of more than sixty days to a position at a higher grade with known promotion potential be made under competitive procedures. In this regard, plaintiff contends that the Area Office preselected persons to fill positions by first detailing them to that position which allegedly gave them the requisite experience to compete successfully in merit staffing. The evidence indicates that the person so detailed did not at all times gain the promotion. For example, Hansel Hall, a black, successfully competed against Orville Gardner, a white, who, unlike Hall, had been detailed previously to the position of Equal Opportunity Officer. Also, Charles Morton, a black, who had been detailed to the position of Supervisory Realty Specialist, was not selected to fill that position.

Also, plaintiff's contention that a detailee enjoyed a decided advantage over a nondetailed candidate in merit staffing has little support in the evidence. With regard to the four positions involved herein, the selected candidates successfully competed in merit staffing because of their extensive experience, skill and knowledge acquired independently from details. For instance, John Miller, the selectee to the position of Special Assistant to the Area Director, had, before his appointment, served in a supervisory position which was eliminated in reorganization, and he had ten years of experience at the Area Office. Also, G. Richard Russell, the selectee to the position of Single-Family Services Officer, had ten to fifteen years of experience at the Area Office and he had served previously in a supervisory position as Chief of the Multi-Family Valuation Section. Rae Ginger, the selectee to the position of Supervisory Realty Specialist, had previously acquired real estate experience while in the private sector. Orville Gardner, the original selectee to the position of Equal Opportunity Officer but who declined the appointment, had had experience in civil rights matters. And finally, Hansel Hall, the selectee to the position of Equal Opportunity Officer, had not been detailed to the position.

In this same light, the plaintiff contends that his superior's refusal to assign him to supervisory details acted to preclude him from gaining promotions to supervisory positions. The evidence is unclear whether plaintiff made a specific demand to be detailed to all the positions in question. Some time before October 21, 1974, his superiors knew of his general desire to be detailed to supervisory positions, but it is unclear whether he made known his desires in January through June of 1974 when the position of Special Assistant to the Area Director remained vacant, or whether his desires were known relative to the positions of Supervisory Realty Specialist or Single-Family Services Officer. It is clear, however, that his desires were known relative to the position of Equal Opportunity Officer. In fact, Choice Edwards, Deputy Area Director, helped him by attempting to obtain clearance from the HUD Regional Director, a black, who refused to request because he felt plaintiff was incapable of performing the job.

Indeed, the evidence indicates that the selected candidates to the four positions in question were better qualified than plaintiff. Despite the occasional departures from the Civil Service merit staffing proce-

dures, there is no evidence to indicate that racial pre-selection obtained regarding the four positions in question. Plaintiff was not given supervisory details because as a Construction Analyst he lacked the necessary skills and experience as his field of expertise was rather narrow and technical.

Plaintiff contends that the refusal of his superiors to permit him to attend supervisory training to enable him to learn management skills so that he could compete successfully for supervisory positions is circumstantial evidence of an intention to discriminate. Evidence indicates that agency regulation prohibited supervisory training to nonsupervisors for the reason that the training of nonsupervisors as supervisors would be a form of pre-selection. Indeed this rule was broken only four times during the relevant period here involved. Two of the nonsupervisors were white and two, including plaintiff, were black.

Plaintiff contends that circumstantial evidence of an intention to discriminate was manifested by racial animus which included (1) plaintiff's superiors making derogatory statements about blacks, (2) blacks were not hired from January of 1974 to March of 1975, (3) plaintiff's superiors were unduly more harsh in disciplinary matters with black employees than with white employees, and (4) James Armstrong, the then Area Director, had fallen asleep during a meeting with black realtors concerning their grievances relative to HUD's real estate practices.

The record does indicate that Armstrong may have made derogatory comments about blacks; however, the persons who made these assertions against Armstrong failed to appear at trial. Further, despite Armstrong's alleged racial prejudices, Choice Edwards testified that Armstrong's private feelings did not affect his hiring decisions, and he believed that blacks had equal opportunities for advancement. Indeed, during the period here involved, the percentage of blacks at all grade levels actually increased during Armstrong's tenure as Area Director.

There were no blacks hired to permanent positions during the period of January 1974 to March 1975, but two were hired as summer aides. The evidence shows that six whites were hired to permanent positions during this somewhat narrow time span which covers only partially the relevant time here involved, and that the Indianapolis HUD Area Office was undergoing a reorganization, resulting in a hiring freeze.

Despite one isolated incident where Choice Edwards testified that he believed that Armstrong's discipline of Charles Morton, a black, exceeded that given to whites relative to Morton's purchase of a HUD single-family house, the evidence fails to support plaintiff's contention that his superiors were unduly more harsh with blacks than with whites.

Although there was evidence that Armstrong fell asleep during a meeting with black realtors, these periods of somnolence also occurred when Armstrong met with white realtors.

Plaintiff's final contention, that circumstantial evidence of a discriminatory intent existed, is based upon the use of statistics contained in the Civil Service Commission Appeal Board decision. However, the Court attaches little weight to the Commission's use of these statistics because of the narrow time span in which the statistics are based and of the inaccuracies contained therein.

The Court, cognizant of the fact that the Indianapolis HUD Area Office departed at times from the Civil Service merit staffing procedures during the relevant period here involved, finds that with regard to the four positions in question, the plaintiff was not discriminated against on the basis of race, but he was denied details and promotions because of his narrow technical field of expertise. The evidence shows that the persons selected over him were better qualified for the positions.

By reason of the foregoing, the Court hereby adopts as and for its own defendant's proposed findings of fact and conclusions of law with modifications in conformity herewith.

IT IS SO ORDERED.

### FINDINGS OF FACT AND
### CONCLUSIONS OF LAW

(Sample Abbreviations:

| | | |
|---|---|---|
| Trial Transcript, page 5 | : | "Tr. 5" |
| Administrative Record, page 5 | : | "R. 5" |
| Hearing Transcript, page 5 | : | "H.Tr. 5") |

### FINDINGS OF FACT

1. Plaintiff is a citizen of the State of Louisiana, and at all material times was an employee of the Department of Housing and Urban Development, Indianapolis, Indiana.

2. Defendant, Samuel R. Pierce, automatically substituted pursuant to Fed.R. Civ.P. 25(d)(1), is Secretary of the Department of Housing and Urban Development, sued in an official capacity.

3. This is an action for injunctive relief, including back pay. Plaintiff claims he was discriminated against on the basis of his race in training and promotion activities in the Indianapolis HUD Area Office during the period 1974–1975. Plaintiff sues under Title VII of the Civil Rights Act of 1964, specifically 42 U.S.C. § 2000e–2(a), which prohibits employer discrimination on the basis of race, §§ 2000e–5(h)(1) and (3), which authorizes an individual claiming discrimination to bring suit after exhausting administrative remedies, and § 2000e–16, which prohibits discrimination in hiring and promotion by government agencies, and incorporates the judicial review provisions of § 2000e–5.

*I. History of the Case and Prior Investigations.*

4. Plaintiff, John H. Warrick ("Warrick") filed an agency grievance on May 27, 1974, wherein he alleged the following (R. 417–18):

This action is the result of a continuing practice and a condition that has existed in the HUD Indianapolis Office for a period of *more than a year.* The practice of selecting persons to detail to positions in order that the person may obtain the necessary experience is unfair and discriminatory. (Emphasis supplied.)

The grievance also made reference to certain individuals whom Warrick felt impeded his progress, but no other discriminatory practice was identified.

5. As the grievance was filed with the HUD Area Office Director (R. 416), it was not part of the EEO process. Apparently believing the contrary, Warrick filed a "formal grievance" with the Civil Service Commission on October 9, 1974 (*Id.*). By letter of October 22, the Commission informed Warrick that it was without jurisdiction in the matter, but suggested an informal resolution (R. 414).

6. On February 18, 1975, Warrick contacted an EEO counselor, alleging discrimination (R. 3). On March 28, he filed a formal complaint with the HUD Regional Administrator (R. 403). The complaint again referred to the "pattern and practice" of detailing, but made reference to no other discriminatory practice. By memo dated March 24, Warrick was advised that his complaint must be specific (R. 413).

7. In response to the complaint, HUD commenced an investigation, which included in its scope the hiring and promotion practices of the Indianapolis HUD Area Office.

The investigators compiled some twelve affidavits from persons in the Area Office, prepared an extensive personnel survey, and analyzed four promotions which Warrick claimed to have been processed in a discriminatory manner. These four challenged promotions, and the persons filling the positions were as follows:

| | Position Title | Date Filed | Selectee |
|---|---|---|---|
| 1. | Special Assistant to Area Director | 8/18/74 | John Miller |
| 2. | Supervisory Realty Specialist | 10/18/74 | Rae Ginger |
| 3. | Single-Family Services Officer | 8/27/75 | G. Richard Russell |
| 4. | Equal Opportunity Officer | 4/29/74 | Orville Gardner (withdrew) |
| | | 9/16/75 | Hansel Hall |

Of the five persons selected over Warrick, one, Hansel Hall, is black. From the evidence it is unclear whether Warrick applied for the position of Special Assistant to Area Director as there was evidence that the position was filled by a lateral transfer, not by merit staffing.

8. In an affidavit prepared September 2, 1975, during the course of the agency investigation, Warrick claimed that the practices about which he complained commenced when his then-Area Director assumed office (R. 420):

> I believe that records and testimony will show that since January 20, 1974, there have existed flagrant patterns and practices of discrimination in this Area Office, all abuses by Mr. Armstrong and members of his staff.

(Armstrong was Area Director from January 20, 1974, until September 1977 (Tr. 139). However, the September 2, 1975 affidavit was far broader than the complaint. For the first time, Warrick made the additional claim that he was denied certain training courses which would allegedly increase his promotion potential (R. 429). He also complained that he was not selected for the speaker's bureau (R. 431), mentioned political influence (R. 433–34), and other matters. Nonetheless he adhered to his claim that the alleged pattern and practice began in 1974:

> Prior to Mr. Armstrong's arrival in January, 1974, I believe that there was hope for minority persons to advance, but since his coming, I believe there has been a consistent policy of racial discrimination
> . . . .

(R. 435.) Yet, in another portion of his affidavit, where Warrick listed examples of "pre-selection" by detailing, two of the three examples occurred prior to January 1974 (R. 424).

9. On January 14, 1976, the agency directed a letter to Warrick, informing him of its findings that no evidence of discrimination existed, and suggesting an informal remedy (Tr. 61). Dissatisfied, Warrick requested a hearing. An evidentiary hearing was conducted on May 4 and 5, 1976, before a Civil Service Commission hearing examiner. The hearing was recorded and transcribed, limited to the period January 10, 1974, to March 1975 (H.Tr. 2). In opening statement, Warrick's attorney referred to the four positions for which Warrick unsuccessfully applied as the discriminatory practice, identifying no other (H.Tr. 4–5).

10. On August 27, 1976, the hearing examiner announced his findings and recommended decision (R. 17). The issues considered were the following (R. 19):

1. Denial of promotional opportunities.
2. Detailing.
3. Training.

The hearing examiner recommended a finding of no discrimination (R. 27).

11. On November 12, 1976, HUD affirmed the decision of the hearing examiner (R. 12). Warrick appealed the decision to the Civil Service Commission by letter of November 28 (R. 29).

12. On August 18, 1978, the Civil Service Commission affirmed the decision of the agency finding no discrimination against Warrick, but criticizing certain office practices. The Commission found (1) strong evidence suggested a general pattern of discrimination at the Indianapolis HUD Area Office, (2) the number of blacks in management positions declined during Armstrong's tenure, (3) Armstrong held racial biases, and (4) substantial evidence indicated that promotional announcements were written in such a manner as to make full use of the qualifications of pre-selected candidates for promotions while minimizing the qualifications of other candidates. Despite these irregularities, the Commission found that Warrick was denied details and promotions with respect to the four positions in question because of his narrow area of expertise.

13. The following issues arising out of the complaint and agency investigation were accepted for review by the Civil Service Commission (R. 4):

1. Whether complainant was denied promotional opportunities due to his race.
2. Whether agency management had a practice of detailing certain employees into positions and subsequently promoting them under merit staffing procedures as part of a pattern of racial discrimination.
3. Whether complainant was denied training opportunities due to his race.

## II. Warrick's Background and Experience.

14. Warrick entered on duty at the Indianapolis HUD Area Office on June 25, 1972, following a transfer from the Gary Service Office (R. 420). The transfer was initiated by Mr. Billy G. Davis, then Director, Housing Management Division (R. 679), whom Warrick later accused of discrimination (R. 400, 417–18). Between his arrival and the filing of his complaint, Warrick worked briefly in Property Disposition (Tr. 96; R. 692), then served as a Construction Analyst (Maintenance) in Housing Management Division (R. 420). Warrick received a promotion to GS–12 on September 17, 1972, (*Id.*) and was not promoted again during his tenure in Indianapolis.

15. Warrick's position as Construction Analyst (Maintenance) was retitled from "Maintenance Engineer" in his job description (R. 437). The job description described the position as a "technical and engineering function." (R. 438.) The incumbent generally was to work with the staffs of HUD assisted projects, aiding them in solving mechanical, landscaping, and related problems. The job entailed no supervisory responsibilities, and required little direct contact with superiors. Guidance received is normally of an administrative nature with technical and engineering decisions left to the incumbent.

16. Warrick is a college graduate, was at one time a college instructor for Alabama A & M University for a period of two and one-half years, and he attended Kent Law School in Chicago for a period of one and one-half years.

## III. Merit Staffing of Positions in the Indianapolis HUD Area Office.

17. Vacancies were filled, when authorized, on a permanent basis through a process known as merit staffing. Where a vacancy existed which, for any reason, could not then be permanently filled, a temporary procedure known as "detailing" would be used. Detailing was a more informal procedure whereby an individual would be temporarily transferred to the position, usually with no change in pay.

18. Applicable regulations required that details of employees of more than 60 days to a position at a higher grade with known promotion potential be made under competitive procedures. No detail could exceed 120 days. These regulations were not consistently adhered to at the Indianapolis HUD Area Office.

19. In merit staffing, positions were advertised for approximately 21 days prior to the closing date. Vacancy announcements were accompanied by a position description, together with a listing of qualifications required for the position. Candidates were reviewed by an administrative selection committee, which determined which candidates met basic requirements. Candidates who did not meet the basic requirements were designated "ineligible" and not considered further (Tr. 84). The rest were forwarded to a selection panel, usually composed of three persons.

20. Candidates who met the basic requirements for the position were designated "Qualified." Those who exceeded the basic requirements were designated "Well Qualified" and "Best Qualified" as applicable (R. 6–7).

21. If only one person was rated "Best Qualified," that person automatically became the selectee (Tr. 90). If more than one existed, the "selecting official," frequently the person in charge of the area for which the promotion was sought, could freely choose among them (*Id.*). If no "Best Qualified" candidates existed, the "Well Qualified" list could be examined in the same manner (R. 6–7).

22. Eligibles were rated by selection committees in various ways. Two jobs applied for by Warrick used an experimental "point system" (R. 581); the rest did not.

## IV. Assignment of Training Programs in the Indianapolis HUD Area Office.

23. From time to time, various types of training courses or seminars were offered to HUD employees. They might be "refresher" or "new state of the art" courses in a particular field (*see, e.g.,* R. 494), or courses geared to supervisory or management skills.

24. Plaintiff contends that the failure of his superiors to permit him to attend supervisory training was racially discriminatory, and hindered him in his ability to compete for supervisory positions.

25. While training programs are generally available in the area of one's specialty, depending upon availability, supervisory training was by agency regulation limited to supervisors (R. 710, 737). This was because training nonsupervisors as supervisors was a form of pre-selection, giving those receiving the training an unfair advantage in future merit staffing (*Id.;* Tr. 91).

26. The record indicates that four nonsupervisors at the Indianapolis HUD Area Office received supervisory training during the period in issue. Two were white, and two, including Warrick, were black. (R. 7, 428, 494; Tr. 91–92.)

## V. *Detailing.*

27. "Detailing" is the practice of temporarily assigning persons to other positions pending permanent staffing. As stated in Finding 18 above, regulations provided that no detail could exceed 120 days (Tr. 286), and that details in excess of 60 days were to be merit staffed (Tr. 147).

28. Details in the Indianapolis office sometimes violated one or both of the rules just stated.

29. Several of the positions sought by Warrick were filled by the person who had previously been detailed to the position.

30. On one occasion, Warrick competed for a detail which was merit staffed. He was not the selectee (R. 439–46).

31. Agency statistics indicate that during the time period relevant herein, all persons detailed were GS–11 or higher at the time of detailing apparently due to the fact that most of the details were to supervisory positions. Three of the 42 details assigned or approximately 7% were staffed by blacks. One of the black detailees, Larry Wineglass, successfully competed in merit staffing for the position of Chief of Single-Family Mortgage Credit, but he declined the appointment.

32. Agency statistics suggest that blacks comprised 8.1% of all persons at the Indianapolis HUD Area Office, Grades GS–11 or higher (7/86) (R. 486). If one eliminates Messrs. Armstrong and Edwards, who were not available for detail (Tr. 196), the figure drops to 7.1% (6/84). In other words, blacks received details in almost exact proportion to their prevalence in the population from which detailees were selected.

## VI. *Merit Selection for Positions at Issue in this Litigation.*

A. Special Assistant to the Area Director, GS–13, August 18, 1974 (R. 496).

33. The hearing examiner of the Civil Service Commission believed that this position was merit staffed; however, from the evidence it is unclear whether this position was filled by a lateral transfer or by merit staffing.

34. During the summer of 1974 or before, HUD determined that the average "grade" (GS rating) of employees at the Indianapolis HUD Area Office was too high; in other words, too many promotions had been given (Tr. 278–80). As a result, a hiring freeze in upper grade positions was ordered.

35. During the summer of 1974 (Tr. 300), a reorganization of the Indianapolis HUD Area Office was announced, affecting grades 12 and up (Tr. 298).

36. As a part of the reorganization described in Finding 25 above, approximately six positions at grades GS–12 or higher were abolished (Tr. 298). One of the positions belonged to John Miller (Tr. 299), who was then a GS–13 (*Id.*).

37. In the event of a loss of position in a reorganization, attempts are made to place the holder of the position in a vacant, unaffected job within the agency (*Id.*).

38. If reassignment is not possible, reduction in force procedures must be undertaken. This entails the replacement by firing of a less-senior employee, replaced by the person whose job was eliminated (Tr. 301).

39. Each of the GS–12's and up whose jobs were eliminated by the reorganization was detailed to other positions (Tr. 300–01).

40. On June 5, 1974, John Miller was detailed to the position of Special Assistant to the Area Director, a nonsupervisory position (R. 496; Tr. 86–87) at the GS–13 level. Miller was then a GS–13 (R. 496), serving as Deputy Director of Single-Family Operations (*Id.*).

41. At some time prior to August of 1974, a discussion was had among James Armstrong, the then Area Director, Choice Edwards, Deputy Area Director, and Mr. Armstrong's secretary, concerning the then vacant position of Special Assistant to the Area Director. The secretary suggested that John Miller would make a good Special Assistant. Warrick's name was not mentioned, and from the evidence it is unclear whether Warrick's interest in the job was known.

42. At the time, Miller was serving in a supervisory position soon to be eliminated. He was a GS–13 with ten years' experience in the Indianapolis HUD Area Office (Tr. 277). He had previously served as Chief Single-Family Appraiser. His knowledge of office activities was wider than Warrick's (Tr. 278).

43. As the Special Assistant to the Area Director has office-wide responsibilities, a wide range of experience is desirable (Tr. 277).

44. Warrick testified that he applied for this position (Tr. 36), but did not indicate when he applied. In his affidavit to the agency, he does not mention applying for the position (R. 424), although he complains of Mr. Miller's detail. In testimony at the administrative hearing, Warrick claimed to have applied for the position (H.Tr. 361), but was unsure how or even if he was rated (H.Tr. 362). He also stated the following:

Q: So you are only complaining about the detail, which led to [Miller's] promotion, right?

A: Right.

At another point in the hearing, another witness stated that Warrick was not among the applicants for the position, that there were but two, including Miller, and that the other was not a serious application (H.Tr. 299).

45. In August 1974, Miller was selected to fill the position permanently (Tr. 496).

46. There is no evidence in the administrative record suggesting that this position was merit staffed, or that Warrick applied for it before the decision to select Miller was made. At any rate, the Court finds that Miller's wider range of experience made him better qualified for the position. The upcoming elimination of Miller's old job is an additional nondiscriminatory reason for his selection.

47. Warrick filed no complaint of discrimination within 180 days of his nonselection for this position, *see* Finding 6, *supra.*

B. Supervisory Realty Specialist, GS 12–13, October 18, 1974.

48. This position was filled by Rae Ginger, who had previously been merit staffed into the position at the GS 11–12 level (Tr. 556–68). The selecting official was Choice Edwards, Deputy Area Director, who is black (R. 475, 548). The position carried with it the title of Chief, Property Disposition Branch, then consisting of 24 employees (R. 482).

49. Prior to joining HUD, Rae Ginger had substantial real estate experience in the private sector (R. 611).

50. Qualifications for the position included knowledge of real estate terminology, experience in buying, managing or selling real property, knowledge of "realty practices, laws and values," and so on (R. 548–49).

51. Warrick was rated "Qualified" for the position by the Administrative Staff (R. 553). Five others were rated "Best Qualified." The selection committee consisted of four members, two of whom, Edwards and Cecile Beaven, are black (R. 475, 555). The selection was made by Choice Edwards.

52. John Williams, then Director of Administration, Indianapolis HUD Area Office, and black, who testified on behalf of

Warrick at the administrative hearing, and who was in charge of this merit selection, commented about the appointment as follows (R. 611–12):

To my knowledge there was no preferential treatment shown to Mrs. Rae Ginger as to her promotion and reassignment. Mrs. Ginger came from outside of federal service when she joined the area office, she had been employed in the executive area of the Apartment Association of Indianapolis and was hired in Housing Management as a realty specialist, GS–11. Mrs. Ginger is a very ambitious person and a hard worker and she came to the area office being very knowledgeable in the housing problems in the Indianapolis area and in my mind was well qualified for the position. Later on, Mrs. Ginger was detailed into the position of Chief of the Multi-Family Disposition Branch and she was assigned there because of her previous experience while employed in the private sector in dealing in the Multi-Family Program. Later on, I know that Mrs. Ginger was detailed to the Chicago, Illinois area for 60 days in the Property Disposition Office, the Chief of that office has been reassigned and she, acting in his step, did an excellent job in placing his shop in order, that was in 1974. She was assigned to this detail by our area director, Mr. Armstrong, and as a result of this excellent job that she did she more or less blossomed up in the eyes of the director. She was later promoted to a supervisory position which Mr. Warrick also applied to and she was given this promotion through the Merit Staffing Program. I know that Mr. Warrick contended discrimination as to Mrs. Ginger being picked over him for the position, he contending that he had seniority over her as to length of service and in-grade but I feel that in this case they made the proper choice in choosing Mrs. Ginger as she was obviously the best qualified for the position.

53. The Court finds that Rae Ginger was in fact the best qualified person to fill this position, and that the nonselection of Warrick was not the result of racial discrimination.

C. Single-Family Services Officer, GS–13, August 27, 1975.

54. The selectee, G. Richard Russell, was a GS–13. Russell had previously been selected over Warrick for a detail to Operations Division, a detail which was merit staffed. (R. 539–46.)

55. At the time of the merit staffing, Russell had 10 to 15 years of experience in the Indianapolis HUD Area Office (Tr. 280). Choice Edwards, Deputy Area Director, considered him the most knowledgeable person in the office on single-family matters (Tr. 281).

56. The position carried with it the title of Chief of Single-Family Branch, consisting of four subordinate divisions and some 35 employees. Duties of the office included the processing of mortgage insurance applications, underwriting decisions, and work in areas of appraisal, architecture, and family loans. Mr. Russell had prior supervisory experience not gained through details; he had served previously as Chief of Multi-Family Valuation Section. Mr. Warrick, on the other hand, had a college degree in engineering, experience gained as a design engineer for the Illinois State Highway Commission, and he had attended one and one-half years at an A.B.A. accredited law school.

57. Warrick and Russell were the only two candidates for the position. Warrick was rated "Qualified" (R. 521), while Russell was rated "Best Qualified" and selected (R. 519).

58. The Court finds that Russell was in fact better qualified for the position than was Warrick, and that Warrick's nonselection was not a product of racial discrimination.

D. Equal Opportunity Officer, GS–13.

59. This position was filled twice. The original selectee, Orville Gardner (selected 4/29/74; R. 505) withdrew on May 29 (R. 534). Warrick contends he was discriminated against in this selection, but failed to file

a complaint of discrimination within 180 days of his nonselection. *See* Finding 6, *supra.*

60. The position was readvertised and for some reason, Gardner again applied (R. 501). This time, Hansel Hall, a black, was selected on September 16, 1975 (R. 505). The selecting official was Mr. Armstrong (*Id.*). Gardner had been detailed into the position in May 1975, but did not receive the appointment.

61. Hansel Hall had previously transferred to Indianapolis from the Minneapolis HUD Area Office. At Minneapolis, Hall held the same EO Director's position as was advertised here (Tr. 85).

62. Choice Edwards, Deputy Director and a black, attempted to assist Warrick in obtaining a detail to this position (Tr. 196). At the time, EO Officer appointments were required to be approved by the Regional Director for Equal Opportunity (Tr. 197). Edwards contacted the Regional Director, Lucian Watson, who is black, on Warrick's behalf, and suggested Warrick as a possible EO Director. Watson responded that he would not agree to a detail of Warrick to the position, on the grounds that Watson did not believe Warrick could do the job (Tr. 198). In the absence of Watson's concurrence, Warrick was unlikely to obtain the position, regardless of the decision of the merit staffing panel. (*Id.*)

63. This position, like that for Single-Family Services Officer, utilized a "pilot evaluation program," in which candidates meeting minimum requirements were rated according to the following numerical scale (R. 531):

| | |
|---|---|
| Work experience | 50 points |
| Performance appraisal | 20 points |
| Appraisal of supervisory potential/performance | 20 points |
| Training and education | 10 points |

Eighty points or more were required to reach the "Best Qualified" list from which selections were made (R. 531.)

64. Of the three persons rated "Best Qualified" in the initial selection in 1974, their total scores were 81, 83, and 80, while the respective "experience scores" were 44, 42, and 43. In other words, the person with the highest total score received the fewest "experience" points (R. 538).

65. On the second selection, Hall and Gardner were rated "Best Qualified." Experience points awarded were 48 and 50 (R. 508).

66. On both evaluations, Warrick was rated "ineligible" by the administrative staff, and never received a numerical rating (R. 501, 529).

67. The Court finds that Hansel Hall was in fact best qualified for the position, and that Warrick's nonselection was not a product of racial discrimination.

## VII. Statistical Evidence.

68. Plaintiff presented no statistical evidence not already contained in the administrative record.

69. Defendant submitted data showing the raw number of black and white employees at each grade level at the Indianapolis HUD Area Office, for the period June 1973 —December 1979, which was received in evidence without objection as Defendant's Exhibit A.

70. Defendant offered the testimony of Patrick Liao, an economist whose expert qualifications were not challenged. Liao presented certain statistical evidence compiled from Exhibit A, and from statistics compiled by the Census Bureau (Exhibits B and F), and Office of Personnel Management (Exhibits C, D, and E). The reliability of the latter data was not challenged, although its relevance was.

71. Although he was not consistent on the matter at trial (Tr. 232), plaintiff has generally identified James Armstrong, Area Director, as the person responsible for discrimination against him (R. 430, 435). Armstrong was director from January 1974 until September 1977 (Tr. 139). The Civil Service Commission hearing officer limited the period of the complaint from January 20, 1974 to March 1975 (H.Tr. 2).

72. With respect to the racial composition of the Indianapolis HUD Area Office, Liao's statistics show the following:

a. *All Grades* (Exhibit B)—In 1973, prior to Armstrong, the percentage of black employees was 24.3%. For 1974, Armstrong's first year, the figure was 25.1%. In 1975, the percentage rose to 28.6%, rising again to 30.1% in 1976. The percentage dropped to 29.0% in 1977, Armstrong's final year, and declined again, to 27.9% the following year.

b. *Grades 13–15* (Exhibit D)—The percentage dropped from 13.0% in 1973 to 9.5% in 1974, due to the departure of one person. As the number of whites in the "super grades" also declined, the black percentage steadily increased during the remainder of the Armstrong era: 10% in 1975, 10.5% in 1976; and 11.8% in 1977. As previously noted, hiring freezes and reorganizations were in effect in 1974–75.

c. *Grades 9–12* (Exhibit E)—In 1973, blacks made up 12.1% of the "middle grades." The figure rose steadily under Armstrong: 13.3% in 1974, 18.9% in 1975, 19.3% in 1976, and 19.5% in 1977.

73. Liao's data compares the representation of blacks at the Indianapolis HUD Area Office with various other entities. The differences are relatively pronounced throughout the Armstrong years:

a. *Federal Employment in Indianapolis HUD Office vs. Federal Employment, All Grades* (Exhibit C).

During 1973–1979, the percentage of blacks working for the federal government rose from 12.6% to 13.9%. Black employment at all grades in the Indianapolis HUD Area Office ranged from 24.3% in 1973 to 30.1% in 1976, dropping to 27.9% in 1978, rising to 30.2% in 1979.

b. *Federal/Indianapolis HUD Employment, Grades 13–15 (Exhibit D).*

Black representation in the "super grades" hovered around 10.5% in Indianapolis under Armstrong, compared to 3–4% in the federal government as a whole.

c. *Federal/Indianapolis HUD Employment, Grades 9–12* (Exhibit E).

The Armstrong years averaged 18–19%; for the federal government as a whole, 7–8%.

74. From the statistical evidence, it appears that the black representation at the Indianapolis HUD Area Office, at all material times, rose overall, and for GS 9–12 viewed separately, and for GS 13–15 viewed separately. Black representation at each of these levels compares favorably with the percentage of blacks in the Indianapolis area, and the percentage of blacks employed by the federal government overall.

75. Plaintiff contends that only one of 20 supervisors in the Indianapolis HUD Area Office was black (5%) (Plaintiff's Exhibit 8; Tr. 312). Plaintiff presented no comparative statistics which would place this figure in context. It further appears that plaintiff omitted a second black supervisor, Larry Wineglass (Tr. 301–01), which if included, raises the percentage to 9.5% (2/21); and a third, Hansel Hall (R. 501–01) (13.6%; 3/22). However, no evidence was presented as to the relevance of this percentage, as one of the four promotions Warrick sought was itself nonsupervisory (Tr. 86–87). The complaint is based upon the failure to receive a promotion.

## CONCLUSIONS OF LAW

Based upon the foregoing findings of fact, the Court now makes the following conclusions of law.

1. This Court has jurisdiction over the parties and of the subject matter of this action.

2. Despite certain indirect claims by plaintiff to the contrary, *see* Tr. 8, plaintiff is in fact advancing a theory of disparate treatment, not disparate impact. *See Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). In other words, plaintiff claims that he was treated differently from others similarly situated because of his race.

3. Under a "disparate impact" theory, plaintiff would point to employment practices, racially neutral, which disproportionately impact a disfavored group. *Id.*

Here, plaintiff suggests that the practice of detailing persons temporarily to positions, and the office policy with respect to training, which he claims discriminated against blacks in general and him in particular.

a. With respect to detailing, there was no evidence that the natural application of the practice discriminated against blacks. Since plaintiff claims that details were used to pre-select a favored person for a promotion, it is clear that all persons, black or white, who were not selected for a detail were disfavored. Only through intentional action could the practice of detailing work against blacks only. *See Gaballah v. Johnson,* 629 F.2d 1191, 1201 n. 14 (7th Cir.1980). In other words, detailing under these circumstances could be discriminatory only under a disparate treatment theory.

b. Furthermore, there is no evidence that blacks were detailed proportionally less than whites. While details for blacks were few in number, few blacks were available for detail. Of persons in the Indianapolis HUD Area Office GS–11 or higher (the population from which detailers were selected), blacks comprised some 7% of the total (7/86) (R. 486). As three of the 43 details reflected in the record, or 7%, went to blacks (R. 7, 496), there is no apparent disproportionate impact at all.

■ 4. As this is not a class action, Warrick must establish that he was discriminated against. Evidence of a pattern and practice of discrimination is of course admissible. But Warrick must show that he was a victim of the pattern and practice, and was injured thereby.

■ 5. In a disparate treatment case, plaintiff must prove that he

> applied for an available position for which s[he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.

*Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). This prima facie case is sometimes referred to as a rebuttable presumption. *Furnco Const. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The test recited above is a flexible one, varying according to the facts presented. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

■ If plaintiff proves a prima facie case, the burden of producing evidence shifts to the defendant.

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejections.

*Id.* Once done, the burden again shifts to plaintiff to establish that the proffered justification was pretext. *Id.* at 256, 101 S.Ct. at 1095.

■ 6. Defenses available to an employer include that the person selected for the position was better qualified than plaintiff. *Holder v. Old Ben Coal Co.,* 618 F.2d 1198, 1202 (7th Cir.1980):

> A desire to hire the more experienced or better qualified applicant is a non-discriminatory, legitimate, and common reason on which to base a hiring decision....

7. Plaintiff's case rests on several major premises: that the then Area Director was prejudiced against blacks, as evidenced by his statements; that Warrick had made known his desire for a detail to a supervisory position, but did not receive one; that experience gained in a position through a detail was instrumental to success in subsequent merit staffing, due to the point scale system in effect; and that Warrick's lack of experience, through detail or training, is the reason for his inability to prevail in merit selection procedures.

8. As to the matter of the then-Area Director's alleged racial animus, the evidence suggests that such was indeed the case. Some courts have concluded that such an animus is itself sufficient evidence to establish a prima facie case. *Leftwich v. U.S. Steel Corp.,* 470 F.Supp. 758, 764 (W.D. Pa.1979). In view of the other evidence in this case, however, this question need not be resolved. The question is whether the then-Area Director's animus, assuming it existed, affected employment decisions in any way.

9. Plaintiff contends in his trial brief that

> It is hardly a coincidence that under his [Armstrong's] stewardship Black employee advancement halted.

Plaintiff's Trial Brief at 16. Plaintiff's sole support for this contention comes from the decision of the Civil Service Commission Appeal Board (R. 5), which found that plaintiff had not been discriminated against. The Court believes that plaintiffs, and the Commission's use of statistics is at best highly selective.

For example, the Commission notes that, as of August 8, 1975 (R. 480), only one person at GS–13 or above in the Indianapolis office was black, ignoring the appointment of Hansel Hall, a black to a GS–13 supervisory position, on September 16, a fact which appears in the record (R. 500). The Commission contends that only two of the twenty "new hires" were black, a bit gratuitous since discrimination in hiring is not alleged. In fact, the record (R. 488) shows that only five of the remaining 18 were in fact "new hires"; the rest were transfers or temporary positions.

The Commission also notes that blacks achieved a lower grade level through promotion (Grade 8) than whites (Grade 10.2), ignoring the fact that the average grade level for whites was higher before the promotions (and before Armstrong's arrival) as well. Neither the Commission nor plaintiff contend that discrimination existed prior to Mr. Armstrong's arrival (although plaintiff has stated the contrary at times, that is not his position now). Finally, the Commission's statement (R. 6) that "no black received a promotion other than as a part of his career ladder" is simply false, as the merit staffing of Hansel Hall indicates.

At best, the statistics contained in the administrative record cover a narrow time frame, are incomplete, and fail to compare the situation in the Indianapolis HUD Area Office with anything else. The Seventh Circuit's attitude toward such "snapshot" evidence is expressed in *Movement for Opportunity, Etc. v. General Motors,* 622 F.2d 1235, 1245 (7th Cir.1980):

> [I]t is more relevant to look not at a workforce makeup on a given day, but to the chances [the employer] had to change its percentage of . . . minorities through current hiring decisions.

By contrast, defendant's statistical evidence was based upon the racial breakdown of the Indianapolis office between 1973 and 1979, before and after Armstrong's tenure. A detailed recitation of these statistics, see Finding of Fact No. 72, *supra,* is unnecessary. It is enough to note that the percentage of blacks, at all grade levels, increased during Armstrong's tenure, and compares favorably with the percentage of blacks employed prior to Armstrong, in the Indianapolis SMSA, and in the federal government as a whole.

■ 10. Plaintiff's claim that his failure to receive a detail was discriminatory is without merit. There is no evidence in the record that plaintiff made known his desire to be detailed to a specific position before the detail was made (Tr. 94). In the one instance where Choice Edwards attempted to assist Warrick to obtain a detail to the EO position, the Regional Administrator, another black, refused to concur.

Assuming that certain persons were detailed with a thought that they might eventually assume the position, that is not evidence of discrimination; rather, it

> would indicate that no decision between candidates was made at all. Thus, although this explanation of the non-selections amounts to a violation of another rule, it remains a non-discriminatory reason under the *McDonnell Douglas* analysis.

*Gaballah v. Johnson,* 629 F.2d 1191, 1201 n. 14 (7th Cir.1980).

A second flaw in plaintiff's reasoning is his assumption that experience gained through the detail gave the details a prohibitive advantage in the merit selection. Plaintiff relies on the "point system" which afforded 50 out of 100 points for experience, and assumes that the selection panel was concerned with experience at the particular position (Tr. 31, 32, Q. 65).

However, only two of the positions at issue in this litigation used the point system: Single-Family Services Officer (R. 516) and EO Director (R. 5501). As to the latter, Warrick was rated ineligible by the administrative staff and never received a rating.

A glance at the job announcements reveals that far more than experience in the job to be filled was sought. For example, the EO Director announcement (R. 502) sought supervisory experience in general, and specialized experience in areas such as mature judgment, persuasive ability, and so on. In fact, only three of the seven criteria listed under "specialized experience" for the EO position was directly related to the "on the job" experience (R. 503). Most important, the record does not support Warrick's claim that the detailee had a prohibitive advantage in the "experience" category (R. 508, 538).

In short, there is no evidence that Warrick's failure to receive a detail to the four positions at issue in this litigation (he did receive other details) was discriminatory, or that he would have prevailed in the merit staffings had he been detailed.

11. Nor is there any merit to Warrick's claim that a lack of supervisory training was responsible for his failure to be promoted. The evidence establishes that supervisory training was for supervisors, not for persons wanting to become one (R. 710, 737, Tr. 91). Even line supervisors had not all received training (Tr. 91). And as it turns out, Warrick did receive supervisory training in 1974–75, prior to his application for two of the positions at issue in this litigation (Tr. 92).

As previously noted, it appears from the record that the rule limiting supervisory training to supervisors was broken four times—twice for blacks and twice for whites (R. 7, 494, Tr. 92). The Civil Service Commission Appeals Board mentioned only the latter in its decision (R. 7).

█ 12. Assuming that plaintiff applied for all positions in question other than EO Director, for which he was rated ineligible, plaintiff appears to have made a prima facie case of discrimination under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in that he applied for several positions, did not receive them, and is a member of a protected class.

13. However, defendant has articulated legitimate, nondiscriminatory reasons for each of the challenged actions. Specifically:

a. The persons selected for the four positions at issue were better qualified than plaintiff for those positions.

b. Warrick's interest in the details for the four positions either was not known, or was considered and rejected under circumstances which could not be considered discriminatory (EO director).

c. Limiting of training to those already supervisor was a legitimate method of discouraging pre-selection, the very practice Warrick criticizes.

14. Plaintiff has failed to present any evidence, statistical or otherwise, that the reasons cited above were pretextual.

15. There is no evidence of a pattern and practice of racial discrimination in detailing, promotion or training at the Indianapolis HUD Area Office during any time material to the complaint.

16. Assuming that there was evidence of such a pattern and practice, there is no evidence of its application to plaintiff.

█ 17. Similarly, plaintiff raised additionally at trial claims of discrimination with respect to two other positions: Deputy Director of Operations Division (Tr. 29), and Environmental Officer (Tr. 317), neither of

**910**

which has been at issue at any previous time during the history of this case. As plaintiff's EO complaint did not specify them, nor did the agency investigation touch upon them, they are similarly barred from consideration.

18. The facts and the law are with the defendant and against the plaintiff, and defendant is entitled to judgment in his favor.