Alfred EKANEM, et al.,
Plaintiffs-Appellants,

v.

The HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, INDIANA, et al., Defendants-Appellees.

Nos. 80–2835, 81–1963.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 30, 1982.

Decided Dec. 14, 1983.

As Modified on Denial of Rehearing and Rehearing In Banc Feb. 7, 1984.

564

John O. Moss, Moss & Walton, Indianapolis, Ind., for plaintiffs-appellants.

Gregory J. Utken, Roberts, Ryder, Rogers & Neighbours, Indianapolis, Ind., for defendants-appellees.

Before PELL and WOOD, Circuit Judges, and HILL, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

This is an appeal from an order dismissing plaintiffs' individual and class claims of employment discrimination at the close of plaintiffs' case in chief pursuant to defendants' motion under Rule 41(b) of the Federal Rules of Civil Procedure. Plaintiffs contend that they made a prima facie case for their claims, that dismissal at the close of their case was therefore improper, and that the district court's findings were clearly erroneous and contrary to law. Plaintiffs also assign error to the district court's award of attorneys' fees to defendants. Defendants have petitioned this court for an award of appellate attorneys' fees, and have moved that we strike Appellants' Appendix, Volume II from the appellate record. We address only those issues that have been properly raised on this appeal.

I. *Motion to Strike Appellants' Appendix Volume II*

On or about March 16, 1982, plaintiffs-appellants filed a motion with this court for leave to file an oversized principal

---

* Honorable Irving Hill, Senior District Judge for the Central District of California, is sitting by designation.

brief of 75 pages. We denied the motion on March 18, 1982. On March 29, 1982, plaintiffs simultaneously filed a 50-page principal brief, a 322-page appendix, and a 27-page Appendix, Volume II.

Examination of Appendix, Volume II reveals that it is nothing more than a mislabeled brief. Since we agree with the defendants that the Appendix, Volume II is "a readily transparent effort to circumvent the March 18, 1982 order of this Court," we grant the defendants' motion to strike the Appellants' Appendix, Volume II from the appellate record.

## II. *Background*

Alfred Ekanem and Toni Hardiman Spicer, both black, and Linda Marshall and Donald Kemp, both white, filed suit under Title VII of the Civil Rights Act of 1964 (codified as amended at 42 U.S.C. §§ 2000e to 2000e–17 (1976)) and 42 U.S.C. §§ 1981, 1983, 1985(3), and 1988 against the Health and Hospital Corporation of Marion County, Indiana (the "Corporation"), five officials, and six institutions operated by or associated with the Corporation. The complaint as amended included individual and class claims of racial discrimination in defendants' employment practices, individual claims of retaliation for protesting such discrimination, and individual claims of violations of first amendment rights.

This case was before this court once before on appeal of the district court's grant of a preliminary injunction ordering the Corporation to reinstate Ekanem and enjoining the Corporation from retaliating against Marshall and any others engaged in activity protected under Title VII. *Ekanem v. Health and Hospital Corp.,* 589 F.2d 316 (7th Cir.1978) ("*Ekanem I*").[1] We reversed the district court on the grounds that Ekanem and Marshall had failed to show irreparable harm and a substantial likelihood of success on the merits. Ekanem, however, was reinstated to another administrative position prior to the issuance of our decision and thereafter continued in

the employ of the Corporation until he was discharged in June of 1979.

Trial on the merits began on September 23, 1980. Ekanem amended the complaint on that day to include first amendment claims and an individual Title VII claim based on his June 1979 discharge. After 26 days of trial, plaintiffs concluded their case in chief and defendants moved for dismissal under Rule 41(b). The district court granted the defendants' motion and requested that the defendants submit proposed findings of fact and conclusions of law consistent with the ruling from the bench. On November 28, 1980, the court issued a written order based on the findings and conclusions submitted by defendants.

At the time of its oral ruling, the court did not discuss the issue of attorneys' fees, or suggest that the suit was frivolous. Nevertheless, the written findings submitted by the defendants and adopted by the court noted that the reversal of the preliminary injunction indicated to the plaintiffs that their claims were "frivolous, unreasonable, and groundless," and concluded that since the plaintiffs continued to pursue such clearly groundless claims, the defendants were entitled to costs and attorneys' fees. The district court conducted a full hearing on these issues in March and April of 1981. On May 15, 1981, the district court issued its order finding that defendants were entitled to recover attorneys' fees, that their claim in excess of $125,000 was reasonable, but that the award would be limited to $8,000 in consideration of the plaintiffs' ability to pay.

## III. *Individual Claims*

Plaintiffs contend that they made a prima facie showing of discrimination and retaliation and thus were entitled to have defendants present their evidence in order to give plaintiffs "a full and fair opportunity" to demonstrate that the defendants' reasons for their actions were merely pretexts for discrimination and retaliation. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 255–56, 101

---

1. A more complete statement of the background facts appears in our opinion in *Ekanem*

1. We will not repeat the background statement in this opinion.

S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 805, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973). The plaintiffs base their argument on the three-step procedure for trying a Title VII claim that the Supreme Court outlined in *McDonnell Douglas,* 411 U.S. at 802, 804, 93 S.Ct. at 1824, 1825, whereby the plaintiff presents his case and describes the alleged discriminatory acts of the defendant, the defendant explains why his acts were motivated by legitimate considerations, and then the plaintiff explains why the defendant's stated justifications for its actions were merely pretexts for discrimination.

This three-step process is not a rigid framework, however. Rather, it "is merely a model for ordering and evaluating evidence concerning employment discrimination." *Davis v. Weidner,* 596 F.2d 726, 730 (7th Cir.1979); *see also Gaballah v. Johnson,* 629 F.2d 1191, 1200 (7th Cir.1980). Thus, it is not necessarily error for a district court to grant a Rule 41(b) motion at the close of the plaintiff's evidence based on the argument that the defendant must present evidence of nondiscriminatory justification for his actions so that the plaintiff may then come forward again to present evidence of pretext. *See Gaballah,* 629 F.2d at 1200.

 Rule 41(b) provides that a district court may dismiss a plaintiff's action at the close of the plaintiff's presentation of evidence if the plaintiff has shown no right to relief under the facts and law. In ruling on a 41(b) motion, the district court must examine and weigh all the evidence, not just the evidence favorable to plaintiff. *Sanders v. General Services Administration,* 707 F.2d 969, 971 (7th Cir.1983). Applying Rule 41(b) to Title VII cases, dismissal at the close of the plaintiff's case in chief is proper if the plaintiff fails to present a prima facie case of discrimination. Dismissal is also proper if the record at the close of plaintiff's case in chief contains the defendant's reasons for its actions, and if the evidence in the record is sufficient to support a judgment in the defendant's favor. As we noted in *Gaballah,* 629 F.2d at 1200:

Gaballah's basic contention that a showing of a *prima facie* case under Title VII precluded dismissal at the close of his evidence must fail. . . . [T]he district court was free to proceed to the remaining steps of the *McDonnell* analysis and determine the ultimate issue of whether Gaballah had shown the defendants' reasons to be pretexts for actual discriminatory motivation.

*See also Bugg v. International Union of Allied Industrial Workers,* 674 F.2d 595, 599 n. 6 (7th Cir.1982); *Holden v. Commission Against Discrimination,* 671 F.2d 30, 36 (1st Cir.), *cert. denied,* 459 U.S. 843, 103 S.Ct. 97, 74 L.Ed.2d 88 (1982); *Correa v. Nampa School District No. 131,* 645 F.2d 814, 816 (9th Cir.1981); *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1281–82 (7th Cir.1977).

In this case, the district court had before it not only plaintiffs' trial evidence, which included testimony from Corporation officials, but also the record of the hearing on the preliminary injunction, which the parties stipulated was to be part of the trial record. In reviewing the propriety of the district court's Rule 41(b) dismissal, we will consider all the evidence. We will not overturn the district court's finding that the plaintiffs failed to sustain their burden of proof unless the finding is clearly erroneous. *Sanders,* 707 F.2d at 971.

## A. *Kemp and Spicer.*

 Kemp alleges that he was discharged in retaliation for opposing discriminatory employment practices. Spicer claims that she was discriminatorily discharged in July, 1974, because of her race. In 1978, the district court denied both Kemp's and Spicer's motions for preliminary injunctions. Neither Kemp nor Spicer appealed the district court's denial of a preliminary injunction as to them, and neither Kemp nor Spicer presented substantial new evidence at the 1980 trial. Not surprisingly, the district court reached the same conclusions after the 1980 trial that it had reached after the hearing on the preliminary injunction. Kemp, like Ekanem and Marshall, was discharged upon the clos-

ing of the Corporation's Community Development Health Program ("CDHP"). The district court found that Kemp was not discharged as a result of retaliation, and that Kemp was not denied an opportunity to apply for a transfer, but that Kemp voluntarily chose to take disability retirement on account of his heart condition. The district court found that Spicer had been fired for good cause for sleeping on the job, noting that in the fifteen months of her employment as a telephone operator for the Corporation, she had received numerous warnings about her work performance, including warnings for absenteeism and sleeping on the job. Kemp and Spicer cite no evidence that these findings are clearly erroneous, and, having carefully examined the record below, we conclude that there is none.

### B. *Marshall.*

■ Linda Marshall claims that she was denied promotions and was ultimately discharged as a result of unlawful retaliation. Since the discharge Marshall complains of arises from the same set of circumstances that one of Ekanem's unlawful discharge claims arises from, we discuss Marshall's retaliatory discharge claim in section C. We consider now Marshall's claim that the defendants unlawfully prevented her from being promoted.

In 1978, when we reversed the district court's preliminary injunction prohibiting retaliation against Marshall, we emphasized the complete absence of evidence of any retaliatory acts toward Marshall, observing that "[s]he routinely received favorable performance evaluations, salary increases and promotions through corporate transfer procedures." *Ekanem I,* 589 F.2d at 321. After noting that Marshall offered no additional evidence during the 1980 trial, the district court dismissed her claims. We have reviewed the record and agree with the district court that Marshall's claims are still entirely unsupported by any evidence.

### C. *Ekanem.*

■ Ekanem claims: (1) race discrimination in his subjection to psychological testing; (2) unlawful discrimination and retaliation in his transfer from Assistant Personnel Manager to Deputy Administrator of CDHP; (3) unlawful discrimination and retaliation in his 1977 discharge upon the closing of CDHP and his failure to obtain a transfer to another position; and (4) unlawful discrimination, retaliation, and violation of his first amendment rights in the discharge following his 1978 reinstatement. Plaintiff Marshall was also discharged upon the closing of CDHP. As noted above, she joins Ekanem in his claim of unlawful retaliation.

With respect to the first claim, Ekanem failed to produce evidence that the Corporation treated him any differently than white employees in subjecting him to psychological testing when he applied for the position of Assistant Personnel Manager—a position that he received in January 1974. On the contrary, the evidence shows that the Corporation also required white employees seeking promotions to take the psychological test, and Ekanem did not attempt to prove discrimination under a disparate impact theory. The district court properly dismissed this claim.

■ We addressed the second and third claims in our 1978 opinion, where we held that Ekanem had failed to establish a prima facie case on either of those claims. *Ekanem I,* 589 F.2d at 320. Ekanem failed to present any substantial new evidence in the trial on the merits on his claim that his 1974 transfer from personnel to CDHP was retaliatory, or that his failure to obtain a transfer in 1977 after the closing of CDHP was the result of racial discrimination. Consequently, we affirm the dismissal of those claims for the reasons stated in *Ekanem I.*

■ The new evidence Ekanem offered at the trial on the merits related to Ekanem's and Marshall's claims of unlawful discharge after the 1977 closing of CDHP. Back in 1978 we found that the Corporation had a bona fide business reason for discharging the CDHP employees that negated

any inference of discrimination or retaliation. The reason was that the City of Indianapolis chose not to renew its annual contract for CDHP services with the Corporation and instead granted the contract to Methodist Hospital. Id. During the 1980 trial, the plaintiffs presented evidence that in 1980 the Corporation obtained a contract with the City to again provide CDHP services. The plaintiffs used this evidence in an attempt to prove that the Corporation intentionally failed to obtain a contract in 1977 so that the Corporation could discharge Ekanem, Marshall, and Kemp. Evidence of the 1980 contract is insufficient, however, to support the inference that the 1977 closing of CDHP was an act of retaliation against Ekanem, Marshall, and Kemp rather than the result of the City's unilateral action in awarding the contract to Methodist Hospital. For that reason, and for the reasons given in our 1978 opinion, we conclude that the district court properly dismissed Marshall's and Ekanem's claims that they were wrongfully discharged in 1977.

 Ekanem's most recent claims concern his 1979 discharge. Pursuant to a district court order, the Corporation reinstated Ekanem in October 1978. He was given the position of Administrative Assistant to Stephen Root, the Administrator of Programs for the Division of Public Health. At that time, Dr. Frank Johnson, the black director of the division, told Ekanem he was not interested in Ekanem's pending lawsuit, and the two agreed to respect each other. Although we reversed the district court's reinstatement order in November of 1978, Ekanem remained in the employ of the Corporation.

In February 1979, Ekanem sent a letter to Dr. Frank Lloyd, Director of Medical Research at Methodist Hospital and a prominent black in the Indianapolis community. Ekanem wrote the letter in response to a local television news report critical of the expense of the office furniture Dr. Johnson had ordered, and featuring comments by white Corporation officials. Ekanem's letter complained about the Corporation's treatment of its black administrators, including Dr. Johnson, and requested that Dr. Lloyd exercise his influence in the community "to protect and help [them] from being reduced to nothingness or termination in [the] Corporation." Ekanem suggested that Dr. Johnson and the other named black officials were being compelled to serve as "accomodating blacks" in the Corporation. Tom Hasbrook, President of the Corporation, obtained a copy of the letter shortly after Ekanem sent it and showed it to Dr. Johnson, but no one took any immediate action against Ekanem. Ekanem acknowledges that he wrote the letter without the consent or knowledge of the individuals named in the letter.

On May 18, 1979, Dr. Johnson announced a reorganization of the Public Health programs and distributed a new organization chart to his staff. According to the chart, Stephen Root was to have direct line authority over the heads of five support service units. Ekanem was to be in charge of the unit made up of the Maternal and Infant Care Program ("M & I"), the Family Planning Program, the WIC Program, and Volunteer Services. The new plan was controversial among the staff. Some resented that they would have to go through Root instead of directly to Dr. Johnson, as they had done previously. Others, such as the coordinators of the M & I and WIC programs, did not want to work under Ekanem because of the sharp differences they had had with him over program policies while he was an administrative assistant with no line authority.

On May 30, 1979, Ekanem delivered a 25-page memorandum to Dr. Johnson. In the memorandum, Ekanem discussed his differences with those staff members who objected to working with him, objected to the title of "Administrative Assistant" for his new position, outlined his educational background and prior experience, and proposed that he be designated "Deputy Administrator" to Root with line authority over all five units. Ekanem compared his qualifications to those of the other staff in his unit, noted that his current salary was not significantly different from the salaries

of the persons he was to supervise, and requested an additional increase in salary. In addition, Ekanem stated he would need his own administrative assistant as soon as possible, and attached a job description for that position as well as for "Deputy Administrator."

In a letter dated June 1, 1979, Dr. Johnson requested Ekanem's resignation. The letter spoke of the Division's need for "a team of appropriately trained, dedicated, and coordinated persons . . . [who] must be deployed in accordance with a plan as perceived by the Director and in keeping with administrative and public principles." Dr. Johnson stated that Ekanem's acts indicated that his continued employment would not further that plan. The acts cited were: (1) "[d]elusion [sic] of authority"; (2) "[c]reation of an atmosphere of distrust"; (3) "[h]ostility and acts of disloyalty to the Corporation"; and (4) "[i]mproper supportive attitude to the Health and Hospital Corporation." In Dr. Johnson's deposition testimony, submitted by Ekanem at trial, Dr. Johnson stated that he had been referring specifically to Ekanem's May 30 memorandum and his February letter to Dr. Lloyd. The district court found Dr. Johnson's stated grounds for terminating Ekanem reasonable in light of the considerable evidence that Ekanem's conduct created "a general pattern of discord" and showed a lack of respect and loyalty toward Dr. Johnson and the Corporation. Ekanem does not dispute that he wrote the letter and the memorandum upon which the court based its findings, but asserts that such conduct did not warrant his dismissal and, in any event, was protected. In addition, Ekanem points to testimony concerning a conversation between Dr. Johnson and Mr. Hasbrook, President of the Corporation, in which Hasbrook said "it's too bad we can't fire Ekanem," as proof of pretext.

We cannot conclude that the court's findings on Ekanem's claims of discrimination and retaliation were clearly erroneous. Hasbrook's remarks were made in response to Ekanem's letter to Dr. Lloyd, which characterized Dr. Johnson as an "accomodating black" and a "professional slave" who could not stand up to white Corporation officials without Dr. Lloyd's help. Under these circumstances, and given the evidence that Dr. Johnson acted on his own in deciding to discharge Ekanem, the district court did not err in finding Ekanem had been terminated for the reasons and conduct cited by Dr. Johnson.

■ Ekanem's contention that his conduct was protected by the first amendment is also without merit. Ekanem's May 1979 memorandum to Dr. Johnson, which defendants acknowledge was "the trigger event for his termination," clearly dealt with internal matters concerning the reorganization of Dr. Johnson's department and Ekanem's proposal for a new position that would give him broader supervisory powers and a higher salary. The memorandum did not comment on matters of public concern such as to warrant first amendment protection. *See Connick v. Myers*, —— U.S. ——, —— – ——, 103 S.Ct. 1684, 1689–1691, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Provoda v. Belen Board of Education,* No. 81–1495, slip op. at 4 (10th Cir. May 31, 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 280, 78 L.Ed.2d 259 (1983); *cf. Janusaitis v. Middlebury Volunteer Fire Department,* 607 F.2d 17, 26 (2d Cir.1979) (conduct reflecting plaintiff's private ambitions and purposes rather than comment on matters of public concern).

Ekanem, Marshall, and Kemp also claim that the officials of the Corporation violated the plaintiffs' first amendment rights and their statutory rights under 42 U.S.C. § 1983 by adopting a policy prohibiting all plaintiffs from attending public meetings of the Corporation's Board of Trustees. The evidence that the plaintiffs cite does not support their claim. Rather, the documents cited indicate that the policy the plaintiffs speak of was directed to all members of the Executive Division, not to the plaintiffs. Furthermore, nothing in the record supports the plaintiffs' assertion that the Board meetings from which they were ex-

cluded were public meetings. The district court correctly concluded that Ekanem failed to sustain his burden of proof with respect to his first amendment claims.

## IV. *Class Claims*

 Plaintiffs' class claims were based upon the "pattern or practice" theory of employment discrimination described in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Under that theory, plaintiffs have to demonstrate that the alleged discriminatory practices reflected "standard operating procedure—the regular rather than the unusual practice." *Id.* at 336, 97 S.Ct. at 1854. Plaintiffs attempted to meet their burden by presenting evidence of individual instances of discrimination and a series of statistical analyses of the Corporation's work force. The district court found that the evidence failed to establish a "pattern or practice" of discrimination, noting, in part, that "evidence of isolated or sporadic instances of alleged racial discrimination will not suffice . . . ." (Tr. 3374). *See Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1854.

On appeal, plaintiffs contend that the district court based its decision on erroneous legal principles as well as an erroneous view of the facts. In his ruling from the bench, Judge Steckler rejected the statistical evidence offered by the plaintiffs through Dr. John T. Liell for the following reasons:

> Where I disagreed, or rather, where I elected not to predicate a ruling on Dr. Liell's conclusions is the fact that Dr. Liell in confining his analysis and his studies to the work force within the corporation, he gave no consideration to the availability of suitable or qualified personnel within the work force of the metropolitan district.

(Tr. 3371). Plaintiffs are correct, in asserting that the relevant labor pool was to be found within the Corporation, not the outside community. *Movement for Opportunity and Equality v. General Motors Corp.,* 622 F.2d 1235, 1258 (7th Cir.1980). Given this error and the district court's failure to take into account evidence factoring in job classification and years of service, we ordinarily would remand for supplemental findings applying the correct legal principles.

 Nevertheless, remand is not appropriate in this case since the class lacks a proper representative for most of their class claims, including those for which Dr. Liell presented statistical evidence. From discovery to appeal, defendants have urged that class certification for the claims of discrimination in promotions, job classification, pay, assignment of jobs, denial of advancement through operation of the seniority system, selection for supervisory positions, and application of educational criteria for selection into salaried positions was improper because plaintiffs filed no EEOC charges for those claims, and had no class representatives asserting they had been victims of such discrimination. Although the district court initially rejected these arguments and certified the class, the court accepted defendants' position in its written findings dismissing these class claims. *Ekanem v. Health and Hospital Corp.,* No. IP 77–224–C, slip op. at 45, ¶ 209 (S.D.Ind. Nov. 28, 1980).

The plaintiff class can only raise claims for which they have a representative who is a member of the class, *see General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 2370, 72 L.Ed.2d 740 (1982); *East Texas Motor Freight Systems, Inc. v. Rodriguez,* 431 U.S. 395, 403–04, 97 S.Ct. 1891, 1896–97, 52 L.Ed.2d 453 (1977), and for which one of the named plaintiffs filed specific EEOC charges, *see, e.g., Jones v. First Federal Savings and Loan Association,* 546 F.Supp. 762, 775–76 (M.D.N.C.1982); *Muka v. Nicolet Paper Co.,* 452 F.Supp. 491, 493 (E.D. Wis.1978); *Jones v. United Gas Improvement Corp.,* 383 F.Supp. 420, 426 (E.D.Pa. 1975) (as amended). The plaintiffs assert that they did file class discrimination charges with the EEOC, and, further, that Ekanem was a proper class representative for the pay discrimination claim because the EEOC investigated and allegedly determined that Ekanem had himself been the victim of pay discrimination.

Since plaintiffs Marshall and Kemp are white, only Ekanem and Spicer can be proper representatives for all class claims except the retaliation claim. Spicer filed a discriminatory discharge complaint with the EEOC, but made no allegations of any other discriminatory acts in that complaint. Ekanem filed two EEOC charges: the first alleged that his 1974 transfer was retaliatory and that his subjection to psychological testing was discriminatory; the second alleged that he was unlawfully discharged in 1977.

Ekanem asserts that his first EEOC complaint, filed in February 1975, and the EEOC determination issued in response to that complaint, provide the necessary jurisdictional base to support the class's pay discrimination claim. Ekanem's 1975 complaint alleged that he was transferred in retaliation for charges he made that the Corporation treated certain black employees unfairly. This same complaint also alleged that the Corporation further retaliated against Ekanem by denying him a Corporation-wide cost of living increase, and by giving him a lower salary than he otherwise would have received in his new position. Ekanem's complaint did *not* allege that Ekanem received a lower salary than he was entitled to as a result of racial discrimination against Ekanem. A charge that a given wage is too low because of unlawful *retaliation* is not the same as a charge that a given wage is too low because of unlawful *race discrimination.* The class cannot, therefore, rely upon Ekanem's 1975 EEOC charge as fulfilling the jurisdictional prerequisite for waging the class's pay discrimination claim.

██ Neither can the class rely upon the EEOC's March 3, 1977 determination that Ekanem should have received a higher salary after his 1974 transfer. First, the class is limited to claims falling within the scope of charges that the plaintiff formally files with the EEOC—even if the EEOC expands its investigation and right to sue letter beyond the particular allegations appearing in the plaintiff's EEOC complaint. *Badillo v. Central Steel and Wire Co.,* 495 F.Supp. 299, 305 (N.D.Ill.1980). Moreover, even if we could consider the EEOC determination in deciding whether the class is entitled to wage its pay discrimination claim, the EEOC's determination, like Ekanem's complaint, failed to allege that Ekanem's post-transfer salary was unfairly low because of racial discrimination. Rather, the EEOC found that Ekanem's allegedly low salary was the product of further *retaliation* for the same acts that allegedly resulted in Ekanem's 1974 transfer. The class does not, therefore, meet the jurisdictional prerequisites for waging its pay *discrimination* claim, or any of the other claims mentioned above that were not the subject of formal EEOC charges.

██ Courts will not ordinarily decertify a class once its claims have been tried. However, where initial certification was improper or decertification prior to trial appropriate, a judgment on the merits cannot be upheld. *See Rodriguez,* 431 U.S. at 406 n. 12, 97 S.Ct. at 1898 n. 12; *see also Bishop v. Committee on Professional Ethics and Conduct,* 686 F.2d 1278, 1283, 1285–87 (8th Cir.1982). Given that none of the named plaintiffs filed EEOC charges relating to the class claims mentioned above, the class lacks an adequate representative for these claims. *See Wakeen v. Hoffman House Restaurants, Inc.,* 724 F.2d 1238 at 1245 (7th Cir.1983); *Movement for Opportunity and Equality v. Detroit Diesel,* 18 Fair Empl.Prac.Cas. (BNA) 557, 566 (S.D.Ind.1978), *aff'd,* 622 F.2d 1235 (7th Cir.1980). Disposing of the claims in question through decertification was appropriate. *See Falcon,* 457 U.S. at 161, 102 S.Ct. at 2372; *Wakeen,* 724 F.2d at 1246; *Rodriguez,* 431 U.S. at 406 & n. 12, 97 S.Ct. at 1898 & n. 12; *Scott v. University of Delaware,* 601 F.2d 76, 87–88 (3d Cir.), *cert. denied,* 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979).

██ As to the remaining class claims (retaliation, and discrimination in denial of job transfers, testing, and discipline and discharge), we conclude that the district court's findings were not clearly erroneous, and affirm the portion of the judgment

pertaining to them. Plaintiffs presented no statistical evidence on the retaliation, discrimination in denial of job transfers, and discrimination in testing claims, and have cited no other evidence indicating error in the district court's findings. The court's dismissal of these claims is therefore affirmed.

With respect to the discrimination in discipline and discharge claim, the only evidence plaintiffs presented to establish a prima facie case is that a disparity existed between the racial composition of the defendants' work force and the racial composition of 65 employees discharged between September 28, 1979, and November 29, 1980. This evidence is inadequate to establish that it was standard operating procedure of the Corporation to treat blacks less favorably than whites with respect to disciplinary actions and discharge. For each person on the list, which the Corporation provided, the Corporation gave a nondiscriminatory reason for the discharge. Plaintiffs did not attempt to show that the reason given for the discharge of even one of the minorities on the list was merely a pretext for discrimination. The district court did not err in finding that the plaintiffs failed to sustain their burden of proof.

All class claims were properly dismissed.

## V. *Attorneys' Fees*

The district court awarded attorneys' fees to defendants pursuant to 42 U.S.C. § 1988 (1976 & Supp. V 1981). The district court based this award upon a finding that the plaintiffs pursued their claims after it had become clear, following our reversal of the preliminary injunction, that the claims were "frivolous, unreasonable, and groundless." *See Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). The plaintiffs contend that their continued efforts to pursue their claims after our 1978 decision vacating their preliminary injunction was not unreasonable and vexatious since they presented additional evidence at trial, and since much of the trial concerned class claims that were not the subject of the earlier appeal. The plaintiffs also point to

Ekanem's claims arising from his 1979 discharge both as new grounds for recovery and as evidence supporting the original individual and class claims.

At the post-trial hearing, the court indicated it was proceeding under the theory that a "frivolous" action is one "without any realistic basis for recovery," (Tr. 3658), and concluded that in light of the evidence in plaintiffs' possession, it had been unreasonable for them to pursue their claims. (Tr. 3684–85). The Supreme Court, however, has cautioned against "the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Christiansburg,* 434 U.S. at 421–22, 98 S.Ct. at 700. In this case, plaintiffs could not have known the likelihood of success on the merits of their claims until they had gathered all of their evidence. The record reveals that defendants contested discovery throughout the proceedings, with one discovery issue left unresolved until the court issued an order to produce only days before trial commenced. As the Supreme Court noted:

> Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

*Id.* at 422, 98 S.Ct. at 700.

Defendants maintain that our 1978 ruling on the preliminary injunction, and plaintiffs' failure to present substantial new evidence on the claims addressed therein, takes this case beyond the realm of uncertainty described in *Christiansburg.* Had plaintiffs been unsuccessful in obtaining certification of their class claims and favorable rulings on the discovery issues, the argument that it was unreasonable for plaintiffs to proceed with a full trial might have some merit. However, given plaintiffs' efforts to bolster both their individual and class claims with statistical evidence, some new evidence concerning the events surrounding

the closing of CDHP, and the addition of Ekanem's claims arising from his 1979 discharge, the plaintiffs' pursuit of their claims was not so unreasonable as to justify the imposition of attorneys' fees.

The "pattern or practice" theory of proof set forth in *Teamsters* and its progeny affords plaintiffs wide latitude in attempting to establish circumstantial evidence of unlawful intent. Plaintiffs were permitted to test that theory to its limits. But plaintiffs had no way of predicting to a certainty what the ultimate results of the case would be since this court had not been presented with the evidence of a "pattern or practice" of discrimination, and since the district court continued to rule in favor of plaintiffs on the discovery and class issues. Although it is a close case, we give the plaintiffs the benefit of the doubt and conclude that the district court abused its discretion in awarding attorneys' fees to defendants.

The district court judgment is affirmed in part and reversed in part. The parties shall bear their own costs.