**Kenneth I. KADALA, Individually and Trading as Silver Spring Auto, Plaintiff-Appellant,**

v.

**AMOCO OIL COMPANY, a Maryland corporation, Defendant-Appellee.**

No. 86–3704.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 5, 1987.

Decided June 16, 1987.

---

Fred Cooper Sacks (Sacks & Chapin, on brief), Washington, D.C., for plaintiff-appellant.

Ward Baldwin Coe, III (Whiteford, Taylor & Preston; Baltimore, Md., Douglas W. Johnson, on brief), for defendant-appellee.

Before SPROUSE and WILKINSON, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.

SPROUSE, Circuit Judge:

Kenneth Kadala, an Amoco service station franchisee, appeals from the district court's order dismissing his action against the Amoco Oil Company. Kadala sued Amoco under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.*, to prevent the nonrenewal of his service station franchise. The district court granted Amoco's Rule 41(b) motion to dismiss at the close of Kadala's evidence. It found that Amoco acted in good faith in its decision not to renew Kadala's lease of the service station premises. Kadala's sole contention on appeal is that the district court improperly allocated the burden of proving good faith. We affirm the judgment of the district court.

I.

Since 1965, Kadala has operated an Amoco service station in Silver Spring, Maryland, under a standard franchise and lease agreement. Under the terms of the lease, Kadala was required to obtain Amoco's written consent before using the service station premises for any commercial activities other than sales and services related to Amoco's petroleum products. The lease also provided that Amoco retained the right not to renew Kadala's franchise for any breach of a lease provision. Finally, the lease stated that Amoco's waiver of its right not to renew for a particular breach would not preclude it from enforcing its rights with respect to subsequent, similar breaches.

Kadala, in 1966, opened an automobile rental agency on the premises of the leased station. In 1974, he started selling Maryland State Lottery tickets on the premises. He initiated and maintained both of these activities without obtaining Amoco's written or oral consent. Although Amoco was aware of Kadala's activities, it took no ac-

tion to stop them prior to the execution of his 1982–85 lease.

Despite the station's location on a major highway, Kadala's gasoline sales volume decreased from 632,435 gallons in 1982 to 498,957 gallons in 1984. Amoco attributed this reduction to the congestion caused by Kadala's car rental and lottery businesses. Beginning in 1983, Amoco representatives complained to Kadala that those businesses were interfering with gasoline sales. On at least two occasions in mid–1984, Amoco's territorial sales managers informed Kadala that his additional businesses violated his lease.

In November 1984, Amoco presented Kadala with a new lease containing essentially the same terms as his prior leases, but specifying that he could no longer operate the car rental and lottery businesses on the premises. Kadala refused to sign the new lease. In response to his refusal, Amoco notified Kadala that it would not renew the franchise, citing the rental car and lottery operations as material violations of the lease agreement. Kadala then filed this action under the Petroleum Marketing Practices Act, seeking to prevent the cancellation of his franchise.

In opening argument at trial, Kadala's counsel conceded that the car rental and lottery businesses constituted "technical" violations of the lease agreement. He also stipulated that Amoco had complied with all of the prerequisite acts required by the statute prior to a franchisor's nonrenewal of its service station franchisee. He argued, however, that Amoco's decision to cancel the franchise was not made in "good faith" as required by § 102(b)(3)(A) of the Act. 15 U.S.C. § 2802(b)(3)(A).[1]

At the conclusion of Kadala's case in chief, the district court, sitting as trier-of-fact, granted Amoco's Rule 41(b) motion to dismiss. It determined that Kadala's evidence supported Amoco's planned evidentiary presentation as set forth in Amoco's trial memorandum. The court found that this evidence conclusively established that Amoco's actions were taken in good faith and in conformance with its rights under the lease agreement. The trial court further observed that although Amoco previously tolerated Kadala's lease violations, it warned him on two separate occasions at least six months in advance of the expiration date of his current lease that it would no longer acquiesce to the infractions and would enforce its rights under the lease. Finally, the court found that Amoco's offer of a new lease in November 1984, which Kadala rejected, dispositively demonstrated Amoco's good faith.

Kadala's sole contention on appeal is that the district court improperly allocated the burden of proving Amoco's good faith. According to Kadala, § 105(c) of the Act places the burden on the defendant/franchisor to prove that it acted in good faith in terminating a franchise relationship. He argues that a franchisor cannot meet this burden without making an affirmative presentation of evidence at trial. We disagree.

## II.

Section 105(c) of the Act allocates the respective evidentiary burdens of proof and production at trial. It provides that:

In any action under subsection (a) of this section, the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship. The franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under Section 2802(b) or 2803 of this title, and, if applicable, that such franchisor complied with

---

1. 15 U.S.C. § 2802(b)(3) provides that "[f]or the purposes of this subsection the following are grounds for nonrenewal:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—

(i) such changes or additions are the result of determinations made by the franchisor *in good faith* and the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes for the purpose of preventing the renewal of the franchise relationship."
15 U.S.C. § 2802(b)(3)(A) (emphasis added).

the requirements of Section 2802(d) of this title.

15 U.S.C. § 2805(c). Contrary to Kadala's contention, the franchisor's burden under § 2805(c) is clearly that of "going forward with [the] evidence." The difference between proof and production, however, is of little consequence here.

■■■■ When presented with Amoco's Rule 41(b) motion to dismiss at the close of Kadala's testimony, the district court was bound to weigh and examine all of the evidence in the record at that time. *See Holmes v. Bevilacqua,* 794 F.2d 142, 147 (4th Cir.1986) (*en banc*). If the record contained no evidence of Amoco's good faith, the district court would have been required to deny the motion. In that event, of course, Amoco's procedural burden to come forward with evidence of its good faith would have been triggered. A burden to proceed, however, is not a substantive rule; nor does it mandate inflexible, formalistic rituals of proof. Once a trial court has before it all the evidence necessary to decide a question, the sequential presentation of evidence does not matter. At most, Kadala might have hoped that Amoco's witnesses would negate the evidence of good faith he presented. Kadala, however, was not entitled to rely on that unlikely possibility. Moreover, having introduced all of the evidence necessary to establish the presence of good faith *vel*

*non,* he could not complain of Amoco's failure to duplicate the same evidence. *See Bevilacqua,* 794 F.2d at 148; *Klein v. Trustees of Indiana University,* 766 F.2d 275, 281–82 (7th Cir.1985); *Ekanem v. Health & Hospital Corp. of Marion County, Indiana,* 724 F.2d 563, 568 (7th Cir. 1983), *cert. denied,* 469 U.S. 821, 105 S.Ct. 93, 83 L.Ed.2d 40 (1984).[2]

■■■■ As noted, the trial court found that Kadala's testimony[3] conclusively established that Amoco acted in good faith. We cannot say that its finding was clearly erroneous. *See Bevilacqua,* 794 F.2d at 147 (factual findings made pursuant to Rule 41(b) dismissals are reviewed under the clearly erroneous standard of Fed.R.Civ.P. 52(a)).

In view of the above, the judgment of the district court is affirmed.

AFFIRMED.

**2.** As stated in *Ekanem,* an employment discrimination case with shifting evidentiary burdens similar to those of § 2805(c), "[d]ismissal [pursuant to Rule 41(b)] is ... proper if the record at the close of plaintiff's case in chief contains the defendant's reasons for its actions, and if the evidence in the record is sufficient to support a judgment in the defendant's favor." *Ekanem,* 724 F.2d at 568.

**3.** Kadala testified that an appearance of congestion at a service station can adversely affect gasoline sales by discouraging would-be gasoline customers from entering the station. He admitted that at peak periods during the commuter rush hour an average of five or six persons would be waiting in line to purchase lottery tickets. Moreover, when a "big jackpot" was offered, Kadala stated that as many as eighteen people could be waiting in line at any single time. The lottery machine was located in

the gas station's main sales room, directly behind the gasoline island. According to Kadala, many of his lottery customers parked their cars in front of the station near its street entrances and the gasoline pumps. Kadala further testified that he stored rental cars on the service station premises and that on some days he parked up to eighteen rental cars at the station. Finally, Kadala corroborated Amoco's opening statement that its representatives came to the station on at least four occasions in 1983 and 1984 to complain that the rental and lottery operations were responsible for lost gasoline sales. On two of these visits, Kadala acknowledged that the representatives told him he was in violation of the lease. He also conceded that despite his refusal to heed their directions, Amoco offered to renew the lease in November 1984, provided that he cease his non-Amoco business operations.